*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0020P (6th Cir.)
File Name: 01a0020p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

No. 99-5430

ROQUEL ALLEN CARTER,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00074—John T. Nixon, District Judge.

Argued: August 1, 2000

Decided and Filed: January 18, 2001

Before: MOORE and CLAY, Circuit Judges; HOOD,
District Judge.[*]

———————

## COUNSEL

**ARGUED:** C. Douglas Thoresen, ASSISTANT FEDERAL
PUBLIC DEFENDER, Nashville, Tennessee, for Appellant.
S. Delk Kennedy, Jr., ASSISTANT UNITED STATES

---

[*]The Honorable Denise Page Hood, United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** C. Douglas Thoresen, ASSISTANT FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. S. Delk Kennedy, Jr., ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. A jury found Defendant-Appellant, Roquel Allen Carter, guilty of armed bank robbery in violation of 18 U.S.C. § 2113(d). The district court denied Carter's motions for judgment of acquittal and a new trial and sentenced him to eighty-four months of imprisonment, followed by five years of supervised release.

Although Carter now appeals his conviction on four grounds, we focus primarily on his claim that the prosecution deprived him of his right to due process and a fair trial under the Fifth Amendment when the prosecutor committed prosecutorial misconduct during closing arguments by misstating material evidence and accusing defense counsel of lying. Because we believe that the prosecutor committed misconduct that was sufficient to constitute plain error warranting reversal, we **REVERSE** the judgment of the district court and **REMAND** for a new trial.

### I. BACKGROUND

On October 15, 1996, the Community First Bank of Hartsville, Tennessee (hereinafter "Hartsville Bank" or "the bank"), opened at 8:30 a.m., with four bank tellers, including Terri Lynn Halliburton, working at its customer windows. Sheila Cornwell was the bank's first customer. While pulling away from a carwash bay across the street before entering the bank, Cornwell saw a black male standing next to "a big green older model car." Joint Appendix ("J.A.") at 153. Cornwell testified that this man was wearing coveralls and appeared to be about "five seven, slender build . . . . [with]

proceedings, we **REVERSE** the district court's judgment in this case and **REMAND** for a new trial.

his hair . . . . braided with sprigs, spriggly braided hair sticking up about an inch maybe, half inch to an inch." J.A. at 153-54.

While teller Halliburton was assisting the second customer Kenneth Keller with his bank deposit, she noticed a black man in coveralls enter the bank and approach the desk. Shortly after Keller had arrived, Dwight Holder entered the bank and noticed the man in coveralls, who by then was approaching Halliburton's window. Holder described the man as a black man who was wearing "brown coveralls . . . or tan-looking color coveralls. . . . a baseball cap" and "pretty new looking boots" and who was "between 5-10 and six foot tall." J.A. at 322-23, 326, 343.

When the man in coveralls finally reached Halliburton's window, he handed her a note that "said a 100 and a 50 and a 20"; the other side of the note said "'You will be dead!'" J.A. at 416. Halliburton realized that she was the victim of a robbery and looked to Holder as if to say "'Help me, Dwight." J.A. at 417. Holder testified that he saw the hesitancy in Halliburton's face and looked at the man, at which point the man showed him what appeared to be the butt of a gun.

In response to the note from the man in coveralls, Halliburton gave the man a hundred-dollar bill, a fifty-dollar bill, and a twenty-dollar bill, to which the man responded "'Give it all to me. I have a gun.'" J.A. at 417. While reaching for more money, Halliburton pulled the bait money, setting off the silent alarm, but accidentally making "a gong noise to the middle drawer." J.A. at 418. The robber then took the $170 on the counter and walked out the front door.

After the robber exited, Holder stated aloud, "You have been robbed. . . . Call the police." J.A. at 330-31. Holder then proceeded out the front door and saw "an older type car, [with] kind of a darkish green color" and "an Indiana tag" pull away. J.A. at 331-32. As Holder watched the car pull away, he screamed for someone to write the car's license plate numbers as he called them out; the numbers he called were "either 988831 or 988861." J.A. at 331, 342-43.

Meanwhile, Keller was driving on Highway 25 to return to his restaurant. While on the road, Keller observed a black male recklessly driving a big green car with an Indiana tag. When Keller arrived at his restaurant, he called 911 and reported the car to the police.

By then, the police had arrived at the bank, spoken to witnesses, and put out a broadcast of the vehicle description over the radio, a "Be on the Lookout" ("BOLO"). After hearing the BOLO, Officer Jerry Hickman of the Gallatin Police Department contacted Chief Hank Scruggs of the Hartsville Police Department and told the Chief that he thought he had run a check on the tag number of a car that fit the BOLO description just the night before. Officer Hickman had a practice of running checks on cars with out-of-state tags in the Lackey Circle area, which is a government housing project, to see if they were stolen. Officer Hickman testified that, in the early morning hours of October 15, 1996, he ran a check on an out-of state car that he saw with Indiana tag 99S6881 in the Lackey Circle area. This check revealed that the car was not stolen but showed no other information, as Officer Hickman was unable to process out-of-state tags fully.

After speaking with the Chief, Officer Hickman asked Detective Stanley Hilgadick of the Gallatin Police Department to try to locate the car in the Lackey Circle area. Detective Hilgadick did not locate the car in the area but heard from several people in the neighborhood that "Roquel Halcomb" drove the car. Because Detective Hilgadick had known Barbara Halcomb, Carter's aunt, for several years, he went to her home to ask her if she knew "Roquel Halcomb." Ms. Halcomb informed the Detective that Carter was the person who owned the car in question. The prosecution also contends that, during her interview on October 17, 1996, Ms. Halcomb viewed a videotape taken at a Citgo station in Hartsville, Tennessee, on October 15, 1996, and identified Carter as an individual walking past the cashier in the videotape. J.A. at 186-87, 193-94. Ms. Halcomb, however, testified that she did not identify Carter in the videotape. J.A. at 183-84. On cross-examination, defense counsel elicited

though the evidence against the defendant was strong); *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999) (same).

As our final step, we conclude that the error here was of a magnitude seriously to affect the fairness and integrity of judicial proceedings. As noted above, the prosecutor in this case failed to honor his obligation as a representative of the sovereign when he misrepresented *critical* evidence at the close of trial with no opportunity for an argumentative response and when he made personal attacks on opposing counsel that may have affected the jury's view of counsel's entire defense. To hold that such action does not seriously affect the integrity of judicial proceedings would be tantamount to excusing the prosecutor's deliberate disregard of his duty to uphold the Government's interest in ensuring that "justice shall be done," not that "it shall win a case," and would render a profound blow to our judicial system's ideal of providing each defendant with a fair trial. *Berger*, 295 U.S. at 88.

### III. CONCLUSION

In conclusion, Carter has successfully established that the prosecutor committed misconduct sufficient to warrant reversal under a plain error analysis. Carter has demonstrated that the prosecutor committed clear and obvious error by misstating material evidence at trial and improperly accusing defense counsel of lying. Carter has also shown that such misconduct affected the outcome of the trial. Specifically, Carter has shown that the prosecutor's improper comments were highly likely to mislead the jury, that the effect of the comments was considerable, that the prosecutor deliberately made the improper comments to the jury, and that the strength of the evidence against him was not so overwhelming that it negated the improper comments made by the prosecutor. In sum, because we believe that allowing a conviction to stand here where the prosecutor affected Carter's substantial rights by clearly misstating a key witness's testimony and repeatedly asserting that defense counsel lied during closing arguments would pose a clear threat to the integrity of judicial

fleeing because of his warrant in Indiana when he fled from both Sergeant Lanier and Officer Oliver, and not because he committed the bank robbery in Hartsville. Additionally, Sergeant Lanier's testimony regarding the chase is weakened by the fact that his written report failed to mention that he observed an Indiana license plate and did not identify 99S68881 as an observed license number. Furthermore, at trial many of the witnesses providing circumstantial evidence against Carter, including Holder, Ford, and Cornwell, could not identify Carter as the man they saw on the day of the robbery. Finally, although the police claim that Ms. Halcomb, Carter's aunt, identified him as the person Ms. Ford described in the Citgo station on October 15, 1996, the evidence shows that, contrary to a frequently used police procedure, Ms. Halcomb did not sign or affirm any written statement verifying this identification.

In sum, in light of the evidence suggesting that Johnson perhaps may have been the Hartsville Bank robber and the problems with some of the other evidence presented against Carter, we conclude that Carter has also satisfied the fourth and final factor of the *Carroll* test and thus has shown the prejudice required for relief under a plain error analysis. *See, e.g., Kerr*, 981 F.2d at 1054 (reversing on ground of prosecutorial misconduct where "the testimony of the four 'vouched' witnesses was crucial to the government's case and the prosecutor's argument" and "[o]nly indirect evidence connected [the defendant] to the [crime]"). *Cf. Boyle*, 201 F.3d at 717-18 (reversing for prosecutorial misconduct even

---

himself. This instruction, which comes from the Sixth Circuit Pattern Jury Instructions, does not appear to suggest guilt on the part of Carter because of his decision not to testify or explain incidents of flight. *See* COMMITTEE ON PATTERN CRIMINAL JURY INSTRUCTIONS, PATTERN CRIMINAL JURY INSTRUCTIONS 7.14 (1991 ed.). Rather, the instruction states that evidence of flight *may or may not* indicate a defendant's guilty conscience or intent to avoid punishment. *See Illinois v. Wardlow*, 528 U.S. 119, __, 120 S. Ct. 673, 676-77 (2000) (noting that although flight may be indicative of ongoing criminal activity, there are also innocent reasons for flight from police).

further information from Officer Russ Pulley about Ms. Halcomb's alleged identification of Carter in the videotape. Officer Pulley's testimony revealed that, contrary to a frequently used police procedure, Ms. Halcomb did not sign or affirm any written statement to indicate that such an identification had been made.

With the information Detective Hilgadick received from Ms. Halcomb, the Gallatin Police Department issued a BOLO, which listed information about Carter, including his height, weight, and address in Gallatin, as well as the names of his family members in Indianapolis, Indiana. The BOLO also stated that Carter was a suspect in two robberies and a shooting and had failed to appear for a warrant against him in Indianapolis.

Further into their investigation, the police received more information from Kathleen Ford, an employee at the Citgo gas station in Hartsville, who claimed to have seen a suspicious looking black man at the Citgo station on the morning of the robbery. Specifically, Ford told the Chief that, early in the morning on October 15, 1996, she had seen a black man between five feet, three inches and six feet tall and with curly hair, come into the market; go to the men's room where he stayed for fifteen to twenty minutes; leave the store without purchasing anything; get into an old model, green car; and begin to dress in gold coveralls. Recordings from a surveillance camera in the Citgo market corroborated Ford's testimony, showing a black man, who was wearing a dark-colored jacket with letters on its front, enter and leave the Citgo market as described.

A check with the Indiana authorities revealed that the green car with license number 99S6881 was registered to Rose Colwell from Indianapolis, who testified at trial to selling her car to "Rock Carter" on August 29, 1996. J.A. at 97. She also testified that she let "Rock Carter" borrow her tags while he repaired the car, and that he promised to bring the tags back but never did.

On October 17, 1996, Sergeant James Lanier was patrolling near White House, Tennessee, and saw a black male driving a green car that matched the description of a BOLO he received in connection with a robbery. Sergeant Lanier testified that he ran the tag number of a car, which was Indiana tag 99S6881; followed the car; and later approached the driver at a gas station. The man, however, fled from Lanier and successfully escaped in his green car. At trial, Sergeant Lanier identified Carter as the man he had chased in White House. On the night of the chase, however, Sergeant Lanier identified Terry Johnson, not Carter, as the man who had fled from him. Sergeant Lanier had identified Johnson from a photograph that was provided to him by the authorities in Simpson County, Kentucky after he had called in to report his chase in White House. J.A. at 634, 643. Additionally, Sergeant Lanier's written report of the chase failed to mention that he had observed an Indiana license plate or a license number and did not identify 99S68881 as an observed license number. J.A. at 637-38.

On October 18, 1996, after receiving a "suspicious person" call from the Best Western Hotel in Riverside, Alabama, Officer Rick Oliver went to the hotel where he found a young black man asleep in a green car. After some conversation with the young man, Officer Oliver began a pat-down for weapons. In the middle of the pat-down, however, the man fled with his gun — initially on foot and then eventually in a stolen pick-up truck. At trial, Officer Oliver identified Carter as the man he had stopped in Riverside. He also testified that the jacket Carter was wearing at the time of his arrest was the same jacket that Officer Oliver saw on the man he pursued in Riverside. Carter was later arrested in Lincoln, Alabama, where he was forced outside a barn by police with tear gas.

After Carter's arrest, Officer Oliver inventoried the green car that was abandoned in the hotel parking lot in Riverside. In so doing, he found a number of items, including (1) an Indiana license plate reading 99S6881; (2) receipts in Carter's name from a Firestone tire service center in Indianapolis, Indiana; (3) receipts dated October 8, 1996, from Wal-mart

suggesting that Terry Johnson may have been the robber, not Carter. For example, evidence at trial revealed that both Halliburton, the teller who was robbed at the bank, and Sergeant Lanier, who chased a suspect matching a BOLO for Carter two days after the robbery, initially identified Terry Johnson as the robbery suspect. Additionally, evidence at trial revealed that Terry Johnson had escaped from a prison, where he was serving time for a conviction of robbery and carjacking, on October 1, 1996, and that Terry Johnson was arrested in Lebanon, a town near Gallatin and Hartsville, Tennessee, just two days after the Hartsville Bank robbery. Evidence also showed that Terry Johnson and Carter both had their hair in braids during the relevant period.

In addition to the evidence indicating that Johnson may have been the robber, there also are some weaknesses in the other evidence presented against Carter. For instance, even assuming that it was Carter, and not Johnson, who fled from Officer Oliver and Sergeant Lanier, the negative inference which can be drawn from this evidence is weakened by the fact that Carter may have had another reason to flee from officers: his failure to appear for a warrant against him in Indianapolis.[11]    Therefore, it is possible that Carter was

---

[11]The district court included the following instruction on flight in its charge to the jury:
INSTRUCTION:
*Flight.* You have received evidence that after the crime was supposed to have been committed, the Defendant, Roquel Allen Carter, fled. If you believe from the evidence that the Defendant did indeed flee, then you may consider this conduct, along with all the other evidence, in deciding whether the Government has proved beyond a reasonable doubt that he committed the crime charged. This conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may flee to avoid being arrested, or for some other innocent reason.
J.A. at 577.
In light of Sergeant Lanier's and Officer Hickman's testimony at trial, we do not believe it was an abuse of discretion for the district court to give this flight instruction. Additionally, we do not believe that the flight instruction violated Carter's right not to testify or incriminate

spontaneous comment that could be regretted but not retracted."). Consequently, we conclude that Carter has also satisfied the third factor of the *Carroll* test.

### 4. Strength Of The Evidence

The fourth and final required factor under the *Carroll* test is that the strength of the evidence against the defendant not be overwhelming. We conclude that, while there arguably was sufficient circumstantial evidence presented at trial to support the jury's guilty verdict,[10] this evidence was not so strong as to overcome the improper and inflammatory comments made by the prosecutor. Although numerous pieces of circumstantial evidence presented at trial seem to suggest that Carter may have robbed the Hartsville Bank, we do not consider the cumulative weight of this evidence to be overwhelming, especially in the light of the evidence

---

[10] When considering the evidence in a light most favorable to the prosecution, a reasonable juror could conclude that (1) Ms. Colwell sold Carter the green Chrysler that was recovered by Officer Oliver; (2) Carter was the man Ms. Ford saw enter the Hartsville Citgo station and change into coveralls shortly before the bank robbery; (3) Carter was the man whom Ms. Cornwell saw at the carwash before the bank robbery; (4) Carter's green car was the same car that Mr. Holder saw the robber drive away in after the robbery; (5) it was Carter who fled from both Officer Oliver and Sergeant Lanier; and (6) Carter fled because he knew he committed the robbery at the Hartsville Bank. In sum, a rational fact finder could decide that Carter was the man who robbed Hartsville Bank on October 15, 1996. *See, e.g., United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994) (holding that there was sufficient evidence for a robbery conviction where the getaway car, a red Firebird, was identified by an individual who followed the vehicle and wrote down the license plate; the Firebird had been stolen from a gas station in a nearby city several weeks earlier; the Firebird had a defendant's fingerprints both on its inside and outside on the driver's side; a friend of one defendant testified that he had seen him driving a red Firebird two or three weeks before the robbery; a music tape reported missing by the owner of the Firebird was found in one defendant's house; ammunition for handguns, a spent shotgun shell, and stacks of cash sorted by denomination were found in one defendant's house; a friend testified that the defendants confided in him about the robbery; and an FBI agent testified that he overheard the defendants talking about killing a person who planned to testify against them).

---

and R.H. Music Store in Gallatin, Tennessee, which appear to corroborate the testimony from Anita Duncan, Carter's first cousin, who testified that Carter was driving the green Chrysler at that time in 1996; and (4) a receipt dated October 18, 1996, from Mapco Express in Cornersville, Tennessee, which is south of Gallatin and north of Lincoln, Alabama, where Carter was eventually arrested.

Carter's trial commenced in federal district court on December 8, 1998. One of the Government's key witnesses at trial was Halliburton, the teller who had been robbed at her bank window on October 15, 1996. In her direct examination, Halliburton identified Carter as the man who robbed the bank. During cross-examination, however, Halliburton stated that just two days after the robbery, she saw a Channel 4 TV news clip on a robbery suspect that showed a picture of Terry Johnson[1] but identified the pictured suspect as Roquel Carter. She then called Chief Scruggs to tell him that she just saw a picture of the man who robbed the bank. Prior to seeing the TV news clip, Halliburton had not looked at and was not asked to view a photograph spread of potential suspects. In fact, Halliburton was not asked to look at a photograph spread of suspects until September of 1998, nearly two years after the robbery and just a few months before trial. When she was finally asked to view a photograph spread, Halliburton declined to look at any pictures because she "knew the trial was coming up and [she] just didn't feel comfortable . . . looking at a whole bunch of pictures" and because she "didn't want to look at anything else that might confuse [her]." J.A. at 75, 427. Additionally, at trial Halliburton explained that when she arrived to testify at Carter's trial, she still believed

---

[1] Terry Johnson was arrested on October 18, 1996, in Lebanon, Tennessee, which is near both Gallatin and Hartsville, Tennessee. He had escaped from Simpson County Jail on October 1, 1996, where he was serving time for carjacking and robbery. At the time of his arrest, Johnson had braids in his hair. As noted above, Sergeant Lanier also initially identified Terry Johnson as the man who eluded his capture. The TV news clip on Channel 4 was based upon an interview with Sergeant Lanier that occurred after Lanier had unsuccessfully chased the suspect in White House, Tennessee.

she was going to identify the person she saw in the TV news clip as the robber. She further testified that she changed her testimony only after Agent Whitten, who was sitting at the prosecution's table during trial, told her "it was the right name, Roquel Carter, but the wrong face" on the TV news clip.[2] J.A. at 88.

After defense counsel finished his closing argument, in which he pointed out the changes Halliburton made in her identification testimony, the prosecutor began his rebuttal argument. The beginning of the prosecutor's rebuttal argument was as follows:

> MR. KENNEDY: Ladies and gentlemen, I am going to submit to you to — will try to yell and scream I submit to you, you have heard *one tremendous colossal lie*. Terri Lynn Halliburton Presley testified she did — remember what she said [?] She did not say, "You have got the right guy but the wrong face." And she never said anybody for the Government told her that. Remember what her answer was, she said, "I was told to give an honest answer." The only person who has ever said she said that is Doug Thoresen [defense counsel]. She never said that. *That is a lie, a bold fabrication.* She said, "I was told that the man in the picture is not Roquel Carter." She didn't say, "I was told you have got the wrong guy. On that question, she answered, "I was told to be honest."

> ***** 

> *And it is an absolutely whole lie that she was told that she had the wrong guy on the bank robbery.* She was told to give her honest answer, period. Don't let them sneak that one over on you. Evaluate the case, evaluate what it is, do your job. But don't let that curve sneak across the plate. *It's a lie.*

---

[2] Halliburton's interview with Agent Whitten on December 8, 1998 took place in the presence of the prosecutor in this case. J.A. at 51.

### 3.  Whether The Comments Were Deliberately Or Accidentally Placed Before The Jury

The third required factor under the *Carroll* test is that the improper comments be deliberately placed before the jury. After careful review, we conclude that the prosecutor knowingly and deliberately made his improper comments before the jury. In *Young*, the Supreme Court explained that the proper course of action for an attorney who takes issue with comments made by opposing counsel is for that attorney to object to the offensive comments, not to respond with equally offensive comments. *Young*, 470 U.S. at 13 (noting that "the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury").

In this case, the prosecutor did not object to what he believed was a mischaracterization of Halliburton's testimony by defense counsel, nor did he attempt to refute defense counsel's closing argument by pointing to contradictory evidence presented at trial. Instead, the prosecutor repeatedly claimed that defense counsel, a man whom, as the prosecutor noted during appellate oral argument, he had known for many years and whom he held in high regard, was telling a "colossal lie." In other words, rather than properly object to what he believed were improper statements made by defense counsel, the prosecutor simply committed another clear wrong and thereby eliminated any possibility that the district court could correct defense counsel's wrongs with a curative instruction. When such action is viewed in light of the prosecutor's familiarity with defense counsel, it must be considered deliberate and calculated.

Indeed, the very repetition with which the prosecutor stated that defense counsel had lied, in and of itself, reveals that such comments were not accidentally placed before the jury. *See United States v. Smith*, 962 F.2d 923, 935 (9th Cir. 1992) ("The repeated comments also demonstrate that the errors were not inadvertent; clearly, we are not dealing with a

the man who robbed Hartsville Bank on October 15, 1996, and who changed her identification testimony only after a federal agent informed her that "it was the right name . . . but the wrong face" on the TV news clip.  J.A. at 88.

Finally, we do not believe that the prejudicial effects of the prosecutor's improper comments were any less extensive because the prosecutor later told the jury that it could question the credibility of Halliburton.  The prosecutor stated:

> "I don't know what more I can say to that.  You may question [Halliburton] for sure. . . . [Seeing] her live and in person look at . . . Carter, look at these pictures, and tell you what her honest answer is to the best of her ability, as you watched her go through the thought process for the very first time, and answer the questions.  That is to your benefit as judges of the facts of this case."

J.A. at 561.

As we previously noted in this opinion, juries are apt to place great confidence in the statements of prosecutors, and we do not believe that this brief statement by the prosecutor was sufficient to overcome the prejudice caused by his repeated insistence that defense counsel was lying and that Halliburton had not admitted to being told she had made a mistake.

*****

Q:  And you told Ms. King you were certain [that Terry Johnson, the man you saw on the TV news clip, was the robber]  when she interviewed you?

A:  Yes.

Q:  And you told Agent Whitten you were certain [of the same thing] when he interviewed you in November of 1996 a short time after the bank robbery, is that right?

A:  Yes, sir.

J.A. at 72-73.

J.A. at 560-61 (emphasis added).  Defense counsel never objected during the prosecutor's rebuttal argument.

Once closing arguments concluded, the district court gave its general charge to the jury, and the jury began deliberations.  On the morning of December 16, 1998, the second day of deliberations, the jury sent the district court a message, asking whether it could base its verdict upon circumstantial evidence without basing it upon eyewitness identification.  J.A. at 593.  The district court then responded by providing the following instruction:  "you can base a verdict upon circumstantial evidence but only if that circumstantial evidence convinces you beyond a reasonable doubt that the Defendant is guilty of the crime charged in the Indictment."  J.A. at 594-95.  About an hour later, the jury came back with a guilty verdict.  Defense counsel immediately asked the district court to poll the jury to ask if its members discounted eyewitness testimony and based their verdict on circumstantial evidence.  The district court did not poll the jury, instead asking the foreperson if some jurors based their verdict only on circumstantial evidence and if some were satisfied with the eyewitness identifications.  The foreperson responded in the affirmative, and all the jurors agreed.

## II.  ANALYSIS

Although Carter raises four grounds for appeal in his brief, we focus on only his prosecutorial misconduct claim regarding the prosecutor's comments during closing arguments, as we find such conduct to be reversible error.[3]  Carter argues that his conviction should be reversed and that this case should be remanded for a new trial because the

___

[3] We note, however, that our analysis of Carter's prosecutorial misconduct claim indirectly involves an analysis of Carter's remaining arguments, which are (1) that there was insufficient evidence from which a jury could constitutionally find Carter guilty; (2) that the district court abused its discretion in giving a flight instruction in its charge to the jury; and (3) that the district court abused its discretion by denying both his motion for a mistrial and his motion to strike the entire jury panel on the ground of prosecutorial misconduct during *voir dire*.

prosecutor committed flagrant misconduct during closing arguments. Specifically, Carter contends that the prosecutor misstated the testimony of Halliburton when the prosecutor insisted that Halliburton did not testify that Agent Whitten told her "it was the right name . . . but the wrong face" before she took the witness stand. J.A. at 88. Carter further argues that the prosecutor misled the jury by repeatedly insisting that defense counsel was lying about Halliburton's testimony. For the reasons stated below, we agree that such conduct constituted plain error sufficient to warrant a reversal of Carter's conviction and to remand for a new trial.

The Sixth Circuit has adopted a two-step approach for determining when prosecutorial misconduct warrants a new trial. *See United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994). Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper. *Id.* at 1387; *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). If the remarks were improper, the court must then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal. These four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Carroll*, 26 F.3d at 1385; *see also Boyle*, 201 F.3d at 717*; United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir.), *cert. denied*, 519 U.S. 872 (1996).

When reviewing challenges to a prosecutor's remarks at trial, we examine the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error. *United States v. Young*, 470 U.S. 1, 11-12 (1985); *Collins*, 78 F.3d at 1040. In so doing, we consider whether, and to what extent, the prosecutor's improper remarks were invited by defense counsel's argument. *Young*, 470 U.S. at 12; *Collins*, 78 F.3d at 1040.

counsel's arguments as a restatement of Halliburton's explanation of how she came to identify Carter, instead of Johnson, as the robber, and the reasons why defense counsel believed such changes and explanations lacked credibility, *i.e.* Halliburton's changes reflected her desire to please the prosecution. In other words, we view defense counsel's closing argument as simply a legitimate attempt to cast doubt on the credibility of a witness who, for two years, had held the belief that Terry Johnson, the man she had *confidently* identified as the robber only two days after the robbery,[9] was

---

That seems really strange to me. And it seems really strange that Officer Lanier would do the same thing. I don't know about lightning striking once, but I know lightning struck twice here; it struck twice in the form of Terri Halliburton and struck twice in the same place — in the same place with respect to the testimony of Officer Lanier. . . . It struck with both of these witnesses saying, within two days of this robbery occurring, that [Johnson] is the man.

*****

And before [Halliburton] was told this, there was one person [whom] she had identified as being the bank robber, and it wasn't Roquel Carter; it was this man [Johnson]. And interestingly, that is what Officer Lanier had done.

*****

And I have a great deal of difficulty in believing [that an accused person will be treated fairly in court] *when a witness is told that you have got the right name but the wrong face before the witness hits the courtroom, before the witness has an opportunity of seeing the person,* that that is fair.

*****

There are a lot of false trails here. *And these false trails are a result of the Government's behavior of what they have specifically done in telling witnesses things and not telling them things,* and not proving this case. It's the result of a closed mind, that was closed at ten o'clock on the morning of October 15 of 1996, before this investigation ever got started.

J.A. at 548-51, 558-59 (emphasis added).

[9]Halliburton testified that she told the police she was certain of her identification when she initially identified Terry Johnson as the robber. The relevant portions of the trial transcript read:

Q: . . . . Ms. King of our office interviewed you, is that right?

A: That's correct.

during   closing   argument.[8]      Instead,   we   see   defense

---

[8]In his closing argument, defense counsel stated:

MR. THORESEN:  The next false trail is this picture.  This picture which was broadcast on the night of October 17 by two media stations.  And Terri Halliburton saw this some two days after the robbery when her memory was fresh, when the details of this were fresh — not two years later.  And she identified this man [Johnson] as being the person who robbed her.  That is a false trail.  Since when is it a false trail for a witness to a crime to make an identification of a [perpetrator]?  This [Johnson] is who[m] she identified.  The name Roquel Carter was used and so the Government assumed — the Government assumed that the picture shown on Channel 4 and the picture shown on Channel 2 was really Roquel Carter.  And that assumption stayed there with the Government *for two years*.  And when Terri Halliburton got her subpoena to testify in this case, she still had identified the person who robbed this bank as [Johnson].

And when she came to Nashville, what happened?  Was the respect, given these circumstances, by letting her determine whether or not she had made a mistake, whether or not this was, in fact, the person who robbed the bank?  Was there a line-up conducted?  Did anyone say, "Gosh, we need to get this rectified, we need to see really what is going on here."  Instead of that happening, what happened was the statement was made, "*You got the right name, but the wrong face.  You got the right name, and the wrong face.*"  And that comes from — that comes not from [Halliburton's] mouth, not from the crime victim, not from the person who saw what had happened; it came from the Government's mouth.  And from that moment on, I tell you, that her testimony was poisoned.

She knew that the Government did not think this was the person who robbed her. . . . [This affects] the validity of the identification made by the witness.  It affects the identification, the reliability, whether it's correct or not, whether you can rely upon it, *whether you can go home with the same degree of certainty that you would apply to your ordinary affairs to make important decisions, to rest easily as to a reasonable doubt, that this was the person who robbed the bank.  Instead of some Government agent saying, "You got the right name but the wrong face."*  And isn't that a false trail?  Isn't [that] a huge false trail?

And after that, knowing that that was their opinion, letting this witness come in here and see the only black man in this room, knowing that that is the person who the Government thought was going to be the person, and make an identification.

---

In this case, because defense counsel made no objection to the prosecutor's statements at trial, this court will review for plain error only.  *Collins*, 78 F.3d at 1039.  As this court has previously recognized, "prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it."  *Carroll*, 26 F.3d at 1385 n.6.  In *United States v. Olano*, 507 U.S. 725 (1993), the Supreme Court set forth three factors a defendant must prove to obtain relief under a plain error analysis.  First, the defendant must show that there was an error.  *Id.* at 732-33.  Error is defined as "[d]eviation from a legal rule . . . unless the rule has been waived," and waiver is defined as the "'intentional relinquishment or abandonment of a known right.'"  *Id.* at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  Second, the defendant must show that the error was plain or obvious under current law.  *Id.* at 734.  Finally, the defendant must establish that the plain error affected his substantial rights.  This means that "the error must have been prejudicial:  It must have affected the outcome of the district court proceedings."  *Id.*  If these requirements are satisfied, then the court of appeals should exercise its discretion to remedy the error "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *Id.* at 736 (quotation omitted).  The Supreme Court and this court have subsequently clarified that the *Olano* test involves four steps.  *See Johnson v. United States*, 520 U.S. 461, 466-67 (1997) ("[B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.") (quotations omitted); *United States v. Monus*, 128 F.3d 376, 386 (6th Cir. 1998).  *Carroll* provides, as noted above, four specific factors to consider in evaluating whether a prosecutor's improper conduct or remarks warrant reversal.

## A. Error/Plain Error

We conclude that the prosecutor's conduct during closing arguments not only constituted error but also was plain error. The law is clear that, while counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate evidence or make personal attacks on opposing counsel. *See Young*, 470 U.S. at 9 & n.7; *Collins*, 78 F.3d at 1040. In this case, the prosecutor committed both of these prohibited acts.

First, although the prosecutor correctly stated that Halliburton testified she was told to be honest, he incorrectly stated that Halliburton did not admit to being told she had made a mistake in identifying the robber at the bank. In actuality, Halliburton had conceded on three separate occasions during trial that Agent Whitten had told her, just before she gave her trial testimony, that she had made a "mistake" in her identification of the robber. For example, the trial transcript reads:

Q:  You were the witness to the bank robbery, is that correct?

A:  That's correct.

Q:  And *he [Agent Whitten] told you that you had made a mistake*, is that right?

A:  *Yes, sir*.

Q:  And you accepted that?

A:  Yes, sir.

*****

Q:  You changed your mind about identifying the person [who] robbed the Hartsville bank that you had previously identified *after Agent Whitten on the morning . . . this trial was supposed to start told you*

acknowledged, "even a 'single misstep on the part of the prosecutor may be so destructive of the right of the defendant to a fair trial that reversal must follow.'" *Smith*, 500 F.2d at 297 (quoting *Pierce v. United States*, 86 F.2d 949, 952 (6th Cir. 1936)).

We also do not believe that the prosecutor's comments were an invited response to defense counsel's statements

---

the bench with government counsel, moved for a mistrial, and moved to strike the entire panel on the ground that the prosecutor's questioning was prejudicial because Carter was "not charged with a shoot-out in this case." J.A. at 295. The district court denied the motion but instructed the prosecutor not "to make a reference to a shoot-out or anything else that may have happened." J.A. at 295. Not satisfied with the court's decision, defense counsel reiterated his objection to the prosecutor's line of questioning, stating that he felt the jury panel was affected by the questioning and that its members now knew that "this Defendant has been charged in a shoot-out." J.A. at 296. In response, the district court noted defense counsel's concerns but pointed out that the jury panel did not know Carter had been charged with a shoot-out but had simply "heard something about a shoot-out." J.A. at 296. The court then overruled defense counsel's motion.

At conclusion of the side-bar, the prosecutor proceeded to question the jury panel about connections to Talladega County, Alabama. What is interesting about the prosecutor's questions, however, is that, just immediately after the court pointed out that the panel was not aware of Carter's charge in a shoot-out, the prosecutor, although not directly mentioning or asking anything about Carter's involvement in the shoot-out, asked a question which clearly implied Carter's involvement in a shoot-out in Talladega County. Government counsel asked, "And my question would be, is there anything that you might have heard that might conceivably be connected with *this case*?" J.A. at 296-97 (emphasis added). When viewed in the context of the prosecutor's prior questions during *voir dire*, this question seems to hint indirectly to the jury that Carter was indeed involved in a shoot-out in Talladega County. Thus, the question potentially may have prejudiced the jury panel against Carter.

In sum, as the district court recognized, the prosecutor made improper comments during *voir dire* by making a reference to a "shoot-out." In addition to this comment, the prosecutor also arguably made another improper comment when he asked a question that implied Carter was indeed involved in a shoot-out.

remarks, incapable of infecting the entire trial.  If a prosecutor's comments were simply isolated remarks made during the course of a long trial, then the error caused by such misconduct may be harmless. *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976).

After considering the prosecutor's improper comments within the context of the entire trial, we conclude that such comments were not merely harmless, isolated comments but instead were prejudicial statements that infected the entire trial.  The prosecutor's improper comments occurred during his rebuttal argument and therefore were the last words from an attorney that were heard by the jury before deliberations.  Given the critical nature of Halliburton's testimony, the weaknesses in some of the circumstantial evidence presented at trial, *see infra*, and the lasting impression that certainly remained with the jury after the prosecutor's rebuttal argument, we cannot state that the prosecutor's conduct did not shake our faith in the jury's verdict. Moreover, we do not believe that the fact the prosecutor made these improper comments only during closing arguments alters the extent of the prejudice caused by them.[7]  As we have previously

---

[7] In fact, the prosecutor made improper comments at another time during the judicial proceedings. As Carter argues in his brief, the prosecutor also made improper comments during *voir dire*.  The events occurred as follows.  The prosecutor first questioned the jury panel:

Q:  Anybody here ever been down to — not down to, but spent a lot of time in, grew up in, worked in, got relatives, close friends in Talladega, Alabama? Pell City?  All right.  Ms. Qualls.  Wow, I didn't think I would ring a bell on that one.

A:  I have a good friend who lives in Talladega, Alabama.  But I haven't seen him in a long time.

Q:  Well, let me put it this way, have you had any occasions to hear about — this is 1996 now — anybody, any friends down there who work in law enforcement?

A:  No.

Q:  Had any occasion to hear about a shoot-out with police back in October of 1996, down there?  Does that ring a bell?

A:  No.

J.A. at 294.

Following this line of questioning, defense counsel asked to approach

*that you had made a mistake in identifying the person*?

A:  *That's correct*.

Q:  And when you knew or came into this room after not having seen the photo spread, you knew that Roquel Carter would be in this room?

A:  Yes, sir.

J.A. at 79-80 (emphasis added).

The transcript further reads:

Q:  When you came here from Hartsville on Tuesday, December 8th to testify, you still thought you were going to identify the person who is in these videos [including the TV news clip showing Terry Johnson's picture], isn't that true, as the man [who] robbed you?

A:  Yes, sir.

Q:  What made you change your mind?

*****

A.  It was Tuesday morning.  *They told me there had been a change and they had told me that the person [whom] I had identified on Channel 4 News was not -- his name was not Roquel Carter.*

Q:  Who told you that?

A:  *[Agent] Whitten.*

J.A. at 77, 79 (emphasis added).

The transcript also reads:

Q:   . . . . You testified a moment ago about a mistake. What type of mistake were you told had occurred?

A:   *I was told that it was the right name, Roquel Carter, but the wrong face.*  That was the mistake that I was told they had made on the news.

J.A. at 88 (emphasis added).

In sum, the prosecutor clearly misrepresented material evidence when he asserted that Halliburton had not been told "it was the right name . . . but the wrong face" before she took the witness stand and that "[t]he only person who has ever said that is Doug Thoresen [defense counsel]." J.A. at 560. Given that this court has recognized that it is improper for attorneys, especially prosecutors who generally have the confidence of juries, to misstate evidence, we conclude that the prosecutor's misstatement of the evidence in this case, specifically of Halliburton's testimony, was not only error but also was plain error. *See Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)); *see also Davis v. Zant*, 36 F.3d 1538, 1548 n.15 (11th Cir. 1994) ("It is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation."). *Cf.* A.B.A., ABA STANDARDS FOR CRIMINAL JUSTICE PROSECUTION FUNCTION AND DEFENSE FUNCTION 3-5.8(a) (3d ed. 1993) ("The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.").

Additionally, because this court, along with the Supreme Court, has repeatedly noted that it is improper for counsel to make personal attacks on an opposing advocate, we also conclude that the prosecutor's claims that defense counsel was lying were not only error but also were plain error. *Young*, 470 U.S. at 9; *Collins*, 78 F.3d at 1040. As the trial transcript reveals, the prosecutor personally attacked defense counsel's truthfulness *four times* during his rebuttal argument by asserting that defense counsel was lying about Halliburton's testimony and trying to "sneak . . . one over on [the jury]." J.A. at 561. Specifically, the prosecutor asserted

(cautionary instruction did not neutralize the prejudice of comments that called attention to the defendants' failure to testify because it "failed expressly to instruct the jury that no adverse inference could be drawn from [the defendants'] silence"). *Cf. United States v. Cruz-Padilla*, 227 F.3d 1064, 1069 (8th Cir. 2000) (prejudice caused by prosecutorial misconduct during closing argument was not cured because the district court issued no curative instructions where the defense failed to object to the misconduct). We believe that measures more substantial than a general instruction that "objections or arguments made by the lawyers are not evidence in the case" were needed to cure the prejudicial effect of the prosecutor's comments during closing arguments.[6]  As the Ninth Circuit stated in *United States v. Kerr*, "it is very doubtful that the generalized observations of the court really conveyed a sufficient sense of judicial approval of both content and circumstances needed to dispell [sic] the harm in the core of the prosecutor's statements." 981 F.2d 1050, 1053 (9th Cir. 1992) (quotation omitted).  In conclusion, in light of the suspect circumstances surrounding Halliburton's in-court identification and the fact that no curative instructions were given shortly after the prosecutor's improper comments during closing arguments, we conclude that the prosecutor's misconduct significantly impacted the jury's ability to assess Halliburton's testimony.

**2.   Whether The Prosecutor's Comments Were Isolated Or Extensive**

The second required factor under the *Carroll* test is that the improper comments must be more than mere isolated

---

[6]While we do not rule that it was error for the district court not to instruct the jury *sua sponte* of the impropriety of the prosecutor's comments, we note our belief that the district court should have done so or at the very least, should have called a sidebar conference with the lawyers. *See Young*, 470 U.S. at 10 ("The judge 'must meet situations as they arise and [be able] to cope with . . . the contingencies inherent in the adversary process.'") (quotation omitted, alteration in original). "A trial judge should be alert to deviations from proper argument and take prompt corrective action as appropriate." *Kerr*, 981 F.2d at 1054.

Such prejudice, however, could have been cured, or at least minimized, by curative instructions to the jury. Consequently, we must now determine whether any prejudice caused by the prosecutor's misconduct was cured by instructions given to the jury. *Carroll*, 26 F.3d at 1385 ("The first factor [whether the remarks tended to mislead the jury or to prejudice the defendant] includes consideration of whether the trial judge gave an appropriate cautionary instruction to the jury."). Ordinarily, a court should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error. *See Young*, 470 U.S. at 11-13; *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir. 1996). As a general matter, juries are presumed to understand and follow directions from the court. *United States v. Forrest*, 17 F.3d 916, 920-21 (6th Cir.), *cert. denied*, 511 U.S. 1113 (1994).

In this case, although we believe that the district court could have given an instruction that neutralized the error, we do not believe that any of the jury instructions given at this trial sufficiently cured the prejudice caused by the prosecutor's actions. We note that defense counsel did not request any curative instruction. The only possibly relevant instruction given by the district court was an instruction that "objections or arguments made by the lawyers are not evidence in the case." J.A. at 574. This instruction, however, was made along with all other routine instructions for evaluating the evidence presented at trial. Furthermore, the instruction was not given at the time of the improper comments. Instead, it was given only after closing arguments had been completed and, even then, after a fifteen-minute recess. Therefore, there was nothing directly linking this jury instruction to the prosecutor's misconduct. *See Lent v. Wells*, 861 F.2d 972, 977 (6th Cir. 1988), *cert. denied*, 489 U.S. 1100 (1989) (trial judge's instructions did not cure the error caused by the misconduct because "[n]o curative instructions were given at the time of defense's objections" and the "judge did not mention the prosecutor's improper comments" during his general charge to the jury); *see also Smith*, 500 F.2d at 298

that defense counsel's characterization of Halliburton's testimony was "one tremendous colossal lie," "a lie, a bold fabrication," "an absolutely whole lie," and just plain "a lie." J.A. at 560-61. In sum, because Carter has successfully shown that the prosecutor committed clear error under current law by misrepresenting material evidence and accusing defense counsel of lying, we conclude that Carter has satisfied both the first and second requirements for relief under a plain error analysis.

**B.   Whether The Misconduct Substantially Affected Carter's Rights and Warrants Reversal**

We also conclude, based upon our analysis of the prosecutor's misconduct under the four factors of the *Carroll* test, that the prosecutor's actions affected Carter's substantial rights and warrant reversal.

**1.   Whether The Prosecutor's Comments Were Likely To Prejudice Carter**

The first required factor of the *Carroll* test is that the prosecutor's comments were likely to mislead and prejudice the jury. We believe that Carter has shown that the prosecutor's misstatement of Halliburton's testimony and personal attacks on defense counsel's truthfulness were likely to mislead the jury and cause prejudice to Carter.

At the outset, we note our belief that the prosecutor's misstatement regarding Halliburton's testimony was inherently prejudicial to Carter. This court has consistently recognized that a prosecutor's misrepresentation of material evidence can have a significant impact on jury deliberations "because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Washington*, 228 F.3d at 700; *see also United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991) (Because jurors are likely to "place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions [by the prosecutor] are apt to carry [great] weight against a

defendant" and therefore are more likely to mislead a jury.); *United States v. Smith*, 500 F.2d 293, 295 (6th Cir. 1974).[4] More importantly, the prosecutor's misrepresentation in this case held an even greater potential for misleading the jury because the misstated evidence, Halliburton's testimony, was central to the Government's case. Because Halliburton was the only person who was at the bank during the robbery to identify Carter as the robber, her identification testimony was of critical importance to the prosecution.

Defense counsel recognized the significance of Halliburton's testimony and raised several significant and relevant issues for the jury to consider during his cross-examination of Halliburton. Specifically, he raised important questions regarding the propriety of Agent Whitten's telling Halliburton that "it was the right name, Roquel Carter, but the wrong face" just prior to Halliburton's taking the witness stand. As defense counsel's cross-examination of Halliburton revealed, Halliburton did not even know the name of the man shown on the Channel 4 TV news clip until a few days before trial and did not recall telling the police the name of the man on the clip when she identified him as the robber nearly two years before. Therefore, defense counsel highlighted serious questions regarding whether the name of the man in the clip even mattered to Halliburton before she testified.

---

[4] As the Supreme Court stated in *Berger v. United States*: The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *Berger*, 295 U.S. 78, 88 (1935).

Additionally, defense counsel's cross-examination of Halliburton revealed that Halliburton had no intention to change her previous identification of Johnson until after Agent Whitten told her she had made a mistake, that Halliburton knew Carter was sitting at the defense table before she took the witness stand, and that Carter was the only black person in the courtroom at the time Halliburton testified. In other words, defense counsel pointed out critical problems concerning the reliability of Halliburton's in-court identification and important issues concerning possible attempts by the prosecution to influence Halliburton's testimony before she took the witness stand.[5]

The prosecutor, however, tainted the jury's ability to weigh Halliburton's averments of honesty during her in-court identification of Carter against these suspicious circumstances when he repeatedly asserted that defense counsel was lying and mistakenly claimed that Halliburton did not admit to being told she had made a mistake in her initial identification. With these actions, the prosecutor may very well have caused the jurors, some of whom relied on Halliburton's in-court identification of Carter in making their decision to convict, to question whether they remembered Halliburton's testimony correctly. He also may have further caused these jurors to question other arguments presented by defense counsel who was portrayed by the prosecutor as lying. In sum, the prosecutor adversely influenced the jury's ability to assess Halliburton's credibility and to evaluate her in-court identification of Carter as the robber, in contrast to her previous identification of Terry Johnson as the robber.

---

[5] Other evidence that tends to weaken Halliburton's testimony includes the fact that Halliburton was first asked to view a photograph spread of potential suspects in September of 1998, nearly two years after her initial identification and just a few months before the trial. Furthermore, the only other black person who had even been in the courtroom during Carter's trial was a woman, and "she [was] part of the court personnel." J.A. at 76.