NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0053n.06

Nos. 23-6048/6065

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 30, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| MIGUEL ANGEL HOMEDES (23-6048); JORGE GONZALEZ MONTEAGUDO (23-6065), | ) ) ) ) | |
| Defendants-Appellants. | ) ) | OPINION |

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Miguel Angel Homedes and Jorge Gonzalez Monteagudo appeal their criminal convictions for conspiracy to distribute and possession with intent to distribute cocaine. Both argue that the Government's closing argument at trial contained flagrant misstatements of the record, and Monteagudo additionally argues that an illustrative aid used by the Government was unduly prejudicial. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Facts

This case arises from an investigation that took place in late 2021 and early 2022 into a suspected drug trafficking ring in the Lexington, Kentucky area. In December 2021, officers from both the local police force and the Drug Enforcement Administration began investigating a

suspected cocaine trafficker, Orlando Perez Tadeo, also known as "Rola" and his associates. Agents engaged in both physical and electronic surveillance and placed GPS trackers on several cars used by Tadeo's associates.

On December 10, 2021, an officer observed Orlando Perez Tadeo and two associates, Alberto Perez Tadeo and Daniel Corona Serratos, drive two vehicles to a rest stop on Interstate 75, where they remained for six minutes. Both cars then traveled directly to an apartment complex associated with the suspected drug trafficking organization. Alberto Perez Tadeo got out of his truck at the apartment complex carrying a duffle bag. Surveilling officers observed that the bag seemed to be full of brick-shaped objects consistent with the shape generally used to package narcotics. On February 7, 2022, officers observed the same three men leaving the same apartment complex carrying a duffle bag. Alberto Perez Tadeo got into a truck with the bag and Orlando Perez Tadeo and Daniel Corona Serratos followed in a second car. Officers pulled Alberto Perez Tadeo's truck over and found $181,850 in cash in duct-taped packages in the duffle bag.

On February 28, 2022, officers again saw two cars associated with the drug trafficking organization traveling in tandem to the rest stop on Interstate 75. Officers went to the rest stop to observe and videotape their occupant's movements. Corona Serratos, Orlando Perez Tadeo and a third associate, Saul Vera, were in the cars. Corona Serratos got out of the car and greeted appellant Monteagudo. Based on their greeting, officers surmised that they were "friends or very strong acquaintances." A few minutes later, appellant Homedes joined them carrying a duffle bag. Homedes placed the duffle bag in Corona Serratos's car. Homedes and Gonzalez Monteagudo then walked over to a semi-truck, got inside together, and left the rest area.

Officers pulled over both Homedes and Monteagudo's semi-truck and Corona Serratos's car. Officers did not find either narcotics or cash in the semi-truck. The truck was carrying a

legitimate delivery of goods from Texas, bound for Paris, Kentucky. However, in Corona Serratos's car, officers found ten bricks of cocaine in the duffle bag Homedes had handed over shortly beforehand. Agents from the Drug Enforcement Administration also obtained GPS information for the semi-truck driven by Homedes and Monteagudo and discovered that it had been in the vicinity of the rest stop on Interstate 75 on December 10—the day Alberto Perez Tadeo left the rest stop with a bag containing what appeared to be bricks of narcotics—and on February 7—the day Alberto Perez Tadeo was pulled over with a large quantity of cash.

## B. Procedural History

A grand jury returned an indictment charging Homedes and Monteagudo, along with several other members of the drug trafficking organization with conspiracy to distribute and possession with intent to distribute five kilograms or more of cocaine under 21 U.S.C. §§ 841, 846. Only Homedes and Monteagudo proceeded to trial. At trial, officers testified as to their surveillance and investigation as described above. Vera, who, by that time, had accepted a plea agreement, testified that he had agreed to drive Corona Serratos to the rest area in exchange for $700. When they arrived at the rest area, Corona Serratos complained that "they should be here by now" and that "they are usually on time." Corona Serratos then made a phone call. Shortly thereafter, Homedes and Monteagudo arrived at the rest stop. Vera confirmed that Homedes handed over the duffle bag in which officers later found cocaine.

The Government also presented an expert witness, Officer Clements, who testified to the general patterns of cocaine dealers in Kentucky. He explained that cocaine entering eastern Kentucky almost always comes from Mexico, often by way of California, Texas, or Arizona. Typically, suppliers "front" large quantities of drugs to distributors—that is, the suppliers provide large quantities of drugs to the distributors who then sell the drugs and send payment back. Thus,

it would not be unusual for a large quantity of drugs to be handed over without immediate payment. Drug shipments are not generally directly exchanged for cash, because the organizations do not want to risk losing both if something happens, and because the organizations are aware that law enforcement will have more difficulty seizing the money or prosecuting them for drug crimes if the drugs are never found with the cash. Instead, the supplier employs a courier to bring the drugs, the courier drops off the drugs with the distributor, and the distributor pays the supplier through alternate channels.

Homedes and Monteagudo's theory at trial was that they were simply legitimate truck drivers. Homedes testified that he and Monteagudo met a woman in Texas who had offered to connect them to an escort service in Kentucky. Homedes claimed that he and Monteagudo believed the meeting with Corona Serratos was about setting them up with escorts, and that the duffle bag was empty when he handed it over. The defense focused heavily on the fact that officers found no cash in the semi-truck when they searched it. This, the defense argued, was evidence that Homedes and Monteagudo had not been selling drugs and that the jury should believe their version of events.

Two events at trial are of particular note on appeal. First, the Government used an illustrative aid with photos of members of the alleged drug conspiracy. The aid presented two rows of photos of the co-conspirators along with their various names and nicknames. Five of the photos were drawn from driver's license photos, and one was from surveillance of the subject. The defense objected, arguing that the photos looked like mugshots and that many of the people depicted were not on trial. The Government promised to explain to the jury that the photos were driver's license photos not mug shots—a promise they eventually kept—and argued that the illustrative aid was necessary to help the jury keep all the names straight given the large number

of co-conspirators and the fact that most of them had names with multiple parts along with nicknames. The court permitted the use of the chart, reasoning as follows:

> I will overrule the objection to the photo array. These are Hispanic names, and because of the multiple parts of these names, they could be confusing to some of the jurors. I can say they are certainly confusing to the Court. But I will try to avoid any potential prejudice regarding the photos by having [the prosecutor] explain the origin or these, that these are, in fact, driver's license photographs. I think that will address your concern for any prejudice.

R. 217, Trial Tr., PageID 1321.

Second, during the prosecutor's rebuttal closing argument, he responded to the defendants' contention that their lack of cash was indicative of their nonparticipation in drug dealing:

> Payment for these two individuals? It's no surprise that they didn't have money. They are getting paid by the source in Texas or Mexico. You know, whoever it was that recruited them to bring the cocaine up here is going to pay them. It's not Daniel Corona Serratos. That's the testimony you heard from Officer Clements and others, that's not how the arrangements work. They didn't exchange money for the cocaine at the time. And the Lexington group isn't responsible for paying the couriers, it's whoever they are working for in Texas or Mexico.

R. 219, Trial Tr., PageID 1687-88. Neither defendant objected to this argument when it was made.

The jury found both Homedes and Monteagudo guilty of conspiracy to distribute five kilograms or more of cocaine. The jury found Homedes guilty of possession with intent to distribute five kilograms or more of cocaine and Monteagudo not guilty of the same charge. After trial, Homedes and Monteagudo moved for a new trial alleging that the above quoted portion of the Government's rebuttal contained misstatements of the record. The court found that the prosecutor's comments were "expressly based on evidence before the jury" and denied the motion. The court sentenced each defendant to 120 months' imprisonment. Each defendant filed an appeal. Monteagudo argues that the court erred in permitting the photo illustrative aid and erred in denying the defendants' motion for a new trial based on the prosecutor's comments about the defendant's lack of cash. Homedes challenges only the denial of the motion for a new trial.

## II.    ANALYSIS

### A.  The Photo Array

Trial courts may permit parties to prepare and present to the jury charts, diagrams, or summaries that aid in explaining or simplifying testimony or arguments. *United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998).  Such illustrative aids may "reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent." *Id.* at 1111.  These illustrative aids "are more akin to argument than evidence" as they merely "organize[] the jury's examination of testimony and documents already admitted in evidence." *Id.*  The trial court has the discretion to control the use of such illustrative aids under Federal Rule of Evidence 611(a), which permits a trial court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence[.]"  An illustrative aid may be inappropriate if it is too conclusory or if it provides the jury with inaccurate information, just as a prosecutor's arguments may be inappropriate if they inaccurately summarize the evidence or inject new facts not reflected in the testimony.  *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991) (*abrogated on other grounds by United States v. Gort-DiDonato*, 109 F.3d 318 (6th Cir. 1997)).  The admission of such aids is committed to the sound discretion of the trial court, and, accordingly, we review the use of such an aid for abuse of discretion.  *Id.* at 753-54.

In this case, Monteagudo argues that the illustrative aid the Government used was "nothing more than a way to prejudice and/or mislead the jury into believing defendant was involved with the individuals in the photographs," some of whom had already plead guilty.  Appellant's Br. 5.  We see little risk of prejudice in a chart that exclusively shows pictures and names.  The illustrative aid did not note any connections between the individuals pictured (that is, through a particular

configuration of the photos to suggest proximity or hierarchy, lines between the individuals, or captions suggesting their role). It merely displayed images of the six individuals in two horizontal lines along with their names and nicknames. There is no suggestion by either party that the chart displayed inaccurate information about the individuals' names and nicknames. Insofar as Monteagudo raises the argument he addressed at trial that these photos might look like mugshots to some jurors, the jury was informed that the images of Monteagudo and Homedes were driver's license photos, suggesting nothing about the defendants beyond the fact that they were qualified to drive (a fact both parties agreed upon).

Nor was the chart lacking in value for assisting the jury to understand the evidence as Monteagudo suggests. This was a multimember conspiracy. Witnesses referred to several members of the conspiracy using nicknames. Two members of the conspiracy were related and had similar legal names. As the trial judge noted, in such cases, it can be helpful to the jury to have a reference for which names or nicknames are associated with each individual. The Government's chart provided that reference. The trial court did not abuse its discretion in permitting the Government to make use of it.

### B. Closing Arguments

We have adopted a two-step approach for determining whether alleged prosecutorial misstatements in closing argument merit a new trial. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). First, we consider whether a prosecutor's conduct and remarks were improper. *Id.* If so, we assess whether the impropriety was flagrant and warrants reversal. *Id.* In determining whether the impropriety was flagrant we weigh four factors: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of

the evidence against the accused. *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994). Further, because both defendants failed to object to the comments by the prosecutor, the comments are reviewed for plain error, and we reverse only in "exceptional circumstances" where the error is "so plain that 'the trial judge and prosecutor were derelict in countenancing it.'" *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996) (quoting *Carroll*, 26 F.3d at 1383).

Both defendants thoroughly address the four flagrancy factors and the centrality of the prosecutor's comments to key issues in the case, assuming that the prosecutor's statements were improper. But we must begin with the first stage of the analysis. *Carter*, 236 F.3d at 783. The prosecution has wide latitude during closing argument to respond to the defense's arguments. *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009). Inherent in that latitude is the freedom to argue reasonable inferences based on the evidence. *Collins*, 78 F.3d at 1040.

As the trial court pointed out, the prosecutor's statements in rebuttal drew heavily on the testimony of the Government's expert witness, Officer Clements, who explained that the usual pattern of drug dealers in Kentucky did not involve a direct handoff of large quantities of drugs for large quantities of cash, lest something go wrong. Typically, a courier, paid by the supplier, brought the drugs to Kentucky and handed them off and did not take cash in return. The prosecutor's comments mirrored this testimony. The Government argued that "whoever it was that recruited them to bring the cocaine up here is going to pay them. It's not Daniel Corona Serratos." The Government then explicitly clarified that this argument was based on the "the testimony you heard from Officer Clements" about "how the arrangements work." Similarly, immediately after the clarification, the prosecutor noted that the Kentucky distributors would not be responsible for paying couriers, because that would fall to the suppliers in Texas or Mexico.

The Government's expert provided testimony about the general patterns of drug dealing and supplying in Kentucky. The prosecutor's argument took those general patterns and argued that the jury could apply them to this particular case. One reasonable inference from expert testimony that drug trafficking organizations in Kentucky generally follow a specific business practice is that a particular drug trafficking organization in Kentucky may have followed that practice. The prosecutor was permitted to argue that the jury should make that inference, particularly when the prosecutor explicitly reminded the jury that he was drawing from the general testimony of Officer Clements. *Collins*, 78 F.3d at 1040.

Because the prosecutor's statements were not improper, we need not consider whether they were flagrant or amounted to plain error. No retrial is warranted.

### III. CONCLUSION

For the foregoing reasons, we **AFIRM** the judgment of the district court.