NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0696n.06
Filed: September 25, 2007

No. 06-5876

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

    v.

CYRUS JEFFREY BLAND,

    Defendant-Appellant.

On Appeal from the United
States District Court for the
Western District of Kentucky
at Bowling Green

_____/

**Before:    GUY, ROGERS, and MCKEAGUE, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.**    Defendant Cyrus Jeffrey Bland appeals from his conviction on two counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1). Seeking reversal, defendant argues (1) that the prosecutor committed misconduct in his closing argument sufficient to constitute plain error; and (2) that the district court abused its discretion by allowing the government to present rebuttal testimony. After review of the record and the arguments presented on appeal, we affirm.

## I.

Section 7206, a perjury statute that criminalizes lying on any document filed with the IRS, provides that: "Any person who . . . willfully makes and subscribes to any return, statement, or other document, which contains or is verified by a written declaration that it is

made under the penalties of perjury, and which he does not believe to be true and correct as

to every material matter . . . shall be guilty of a felony. . . ." It is not necessary, however, that

the government prove "the existence of a tax deficiency, exact amounts of unreported

receipts or income, or an intent to evade taxes." *United States v. Tarwater*, 308 F.3d 494,

504 (6th Cir. 2002).

Defendant, who lived in Campbellsville, Kentucky, emphasized that he has only a

high school education and professed not to understand the details of accounting. He ran a

painting business during high school, started an automobile salvage company with a friend

after high school, and bought a textile machine manufacturing business from an in-law. He

also owned a small air-transport company used to carry the textile machinery to customers

around the country. When the textile equipment and air-transport businesses failed in the

wake of NAFTA, defendant purchased and operated a metal reprocessing company that made

metal siding and roofs. Defendant testified that although he could tell when a company was

making money, he relied on long-time bookkeeper Ruby Wilson to monitor the financial

details of his businesses. The companies were operated as "S" corporations, with the income

appearing on his federal income tax returns. Defendant's tax returns were prepared by CPA

Henry Lee based on the information provided by defendant. At its peak, defendant's line of

credit at the bank exceeded $800,000.[1]

It was during a trip to Las Vegas in 1994 that defendant was introduced to gambling

---

[1]Defendant also testified that he suffered for years with back pain, underwent back surgery in 2002, became addicted to pain medication, and received ongoing psychiatric treatment for unspecified mental disorders.

and won $2,500 playing three $100 slot-machine tokens. After returning home, defendant began frequenting nearby casinos and became what the casinos would consider a "high roller" or a "whale." His federal income tax return for 1994 reported $2,500 in gambling income, which was offset by $2,500 in gambling losses. On the 1995 federal tax return, defendant reported $101,000 in winnings and $65,000 in losses. The 1998 return noted a place for "gambling losses," but no gambling income or losses were reported on either the 1998 or 1999 returns.

The evidence showed that defendant won substantial sums gambling in both 1998 and 1999, although the amount of his *net* gambling income remained in dispute at trial. Bank records showed that defendant deposited checks from the casinos into his account and drew cashiers checks written to the casinos. Whenever defendant's payout exceeded $10,000, the casino would file a Currency Transaction Report (CTR). In addition, the casinos kept logs, referred to as "trip sheets," that recorded defendant's activity at the table games. The CTRs alerted the IRS to the gambling income that was not reported. The two-count indictment filed in October 2005 charged defendant with making false statements by failing to report income from gambling on his federal income tax returns for 1998 and 1999.

Defendant's expert, CPA Marcia Lewis, concluded that defendant's net gambling income for 1998 and 1999 was $94,181.74 and $310,000, respectively. Amended returns for those years, along with payment of $165,000, were filed with the IRS shortly before trial. The government's expert, IRS Special Agent Brandon Welch, prepared a revised summary—revised just before trial and in response to Lewis's report—that found defendant's

net gambling income for 1998 and 1999 to be $292,843.90 and $319,241.02, respectively.

While defendant makes much of the fact that the revisions from Welch's original summary

included a reduction of nearly $750,000 in gambling *revenue* for 1998, the "bottom line" is

that the revisions resulted in a relatively modest reduction in the defendant's *net* gambling

income for each year.[2]   Even after these revisions, the government identified gambling

related deposits of $741,999 and $613,800 for 1998 and 1999, respectively.

Before trial, Welch also prepared charts identifying specific items from the casino

records that were not reflected in Lewis's report.  Those charts were not disclosed before trial

or used either in the government's case-in-chief or on cross-examination of Lewis.

Reserving this evidence for rebuttal, the government recalled Welch to refute the defense

expert's calculations.  Defense counsel objected, but the district court permitted the

testimony.  This is the basis for defendant's second claim of error.

Although the IRS initiated its investigation in May 2001, defendant was not contacted

until February 2002.  Defendant testified that he promptly went to an attorney with boxes of

records and learned in short order that he had been under the mistaken impression that he

could "carry forward" his gambling winnings and losses over a five-year period.  Defendant,

who was represented by that same attorney at trial, related the substance of their first

conversation and squarely laid blame for his failure to report the gambling winnings on his

accountant.  This testimony was central to the defendant's claim that he had not willfully

---

[2]Specifically, the government's original summary tallied the net gambling income for 1998 and 1999 at $310,181.74 and $331,954.02, respectively, while the revised summary calculated the amounts to be $292.843.90 and $319,241.02, respectively.

made false statements on the tax returns in question.

Specifically, defendant testified that he told Lee about his gambling winnings, but Lee told him not to worry about it because gambling income could be carried forward or backward for five years as with his businesses. Lee, on the other hand, stated unequivocally not only that the defendant did not tell him about any gambling income for 1998 and 1999, but also that Lee never advised the defendant that gambling income could be carried forward. Lee explained that he prepared the returns from the information defendant provided, and that he would ask defendant if there was "any other income." In closing argument, defense counsel called Lee incompetent and vouched for the defendant's veracity. The prosecutor responded in rebuttal by arguing that defense counsel had helped defendant "concoct" or "weave" a story that could be used as a defense at trial. Although no objection was made at the time, these remarks are the basis for defendant's claim of prosecutorial misconduct.

Defendant testified that, once alerted to the error, he called the casino he had been patronizing and found out that he had won $110,000 and $244,000 in the years 2001 and 2002. According to defendant, he then insisted that the gambling income be reported on the tax returns for those years, even though Lee told Bland he was "wasting his money" and should find a new tax preparer if he would not take Lee's advice. There is no dispute that the returns for 2001 and 2002 reflected gambling income. Defendant testified that he stopped gambling in 2002, after his losses mounted, and that he was later sued by the casino over his gambling debts.

At the conclusion of four days of testimony, the jury found defendant guilty on both

counts. On June 23, 2006, the district court sentenced defendant to 24 months' imprisonment and ordered restitution equal to the tax liability that had not yet been paid. This appeal followed.

## II.

### A.    Rebuttal Evidence

Defense counsel objected to rebuttal evidence from Agent Welch detailing the transactions that Lewis had not taken into account in determining the defendant's net gambling income. Defendant protested, as he does on appeal, that those charts—Exhibits 30 and 32—were prepared before trial from casino records that would be admitted in the government's case-in-chief. As a result, defendant insists that the government could have incorporated the charts into Agent Welch's direct testimony or introduced them following defense counsel's cross-examination concerning the accuracy of Welch's calculations. Alternatively, defendant argues that the charts would most naturally be used during cross-examination of Lewis. Instead, avoiding direct challenge to Lewis's calculations on cross, the government reserved the analysis of her report for rebuttal. As defendant correctly observes, the trial court's decision to admit evidence on rebuttal is reviewed for abuse of discretion. *United States v. Caraway*, 411 F.3d 679, 683 (6th Cir. 2005).[3]

"'The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.'" *United States v. Levy*, 904 F.2d 1026,

---

[3]The government argues that our review is for plain error because the objections were confined to the admission of the charts. While the objection began with the charts, defense counsel also asked that Agent Welch not be allowed to testify in rebuttal. The issue was adequately preserved.

1031 (6th Cir. 1990) (citation omitted). The district judge has discretion to limit rebuttal evidence "'to that which is directed to rebut new evidence or new theories proffered in the defendant's case-in-chief.'" *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 345 (6th Cir. 2002) (quoting *Martin v. Weaver*, 666 F.2d 1013, 1020 (6th Cir. 1981)). Evidence is "new" for purposes of rebuttal if it "'was not fairly and adequately presented to the trier of fact before the defendant's case-in-chief.'" *Id*. (quoting *Benedict v. United States*, 822 F.2d 1426, 1429 (6th Cir. 1987)).

Because Lewis's calculations and conclusions were not fairly and adequately presented *before* the defendant's case-in-chief, Agent Welch's critique of her report was properly offered in rebuttal to disprove the accuracy of her calculations. *Id*.; s*ee also United States v. Tejada*, 956 F.2d 1256, 1266-67 (2d Cir. 1992). Moreover, this court has specifically rejected the argument that admission of proper rebuttal evidence is limited by the fact that it could have been introduced in the government's case-in-chief. *Caraway*, 411 F.3d at 683; *Toth*, 306 F.3d at 345; *Tejada*, 956 F.2d at 1267. Indeed, for real rebuttal evidence, "the [government] has no duty to anticipate or to negate a defense theory in [its] case-in-chief." *Martin*, 666 F.2d at 1020. The district judge, therefore, did not abuse his discretion in allowing Agent Welch to testify in rebuttal.[4]

B.      **Prosecutorial Misconduct**

This court has adopted a two-step approach for evaluating claims of prosecutorial

---

[4]Even if defendant could show an abuse of discretion, error in the admission of the rebuttal evidence would be harmless because even Lewis concluded that defendant had substantial unreported gambling income for the years 1998 and 1999.

misconduct. *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994). First, we determine whether the prosecutor's conduct and comments were improper. *Id*. at 1387. If improper, then we consider and weigh four factors to determine whether the impropriety was flagrant and thus warrants reversal. *Id*. Because no objection was made at trial, however, our review is only for plain error. *United States v. Young*, 470 U.S. 1, 6-7 (1985); *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). To establish plain error, the defendant must demonstrate (1) an error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4), if the first three are shown, that this error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Collins*, 78 F.3d at 1039; *see also United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).

The government concedes that it was improper to make personal attacks on the veracity of defense counsel by suggesting that defense counsel helped the defendant "concoct" or "weave" a story that could be presented in defense at trial. *Young*, 470 U.S. at 9; *Collins*, 78 F.3d at 1040. Turning to the four-factor flagrancy test, this court must determine whether the remarks were so exceptionally flagrant as to constitute plain error. *Carter*, 236 F.3d at 783. The four factors are: (1) whether the remarks tend to mislead the jury or prejudice the accused; (2) whether the comments were isolated or extensive; (3) whether they were deliberately or accidentally made; and (4) whether the evidence against the accused was strong. *Id*. In weighing these factors, we must examine the prosecutor's remarks "within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *Young*, 470 U.S. at 12. This consideration includes

"whether, and to what extent, the prosecutor's improper remarks were invited by defense counsel's argument." *Id.*; *see also Carter*, 236 F.3d 783.[5]

Without arguing that the remarks would tend to mislead the jury about the evidence, defendant maintains that they were prejudicial because the defense depended on the jury's estimation of the defendant's veracity and the prosecutor was asserting that defense counsel had put false testimony in defendant's mouth. This case is unlike *Carter*, where the prosecutor's arguments not only misstated evidence but also accused defense counsel of lying about the testimony. Here, defense counsel injected his own credibility into the proofs, represented he had personal knowledge of the facts, and vouched for the defendant.

As discussed earlier, the defendant was asked to relate the substance of their first conversation in the following exchange:

Q: And then did you come to my office then . . . and bring me all your records that you had . . . in some boxes?

A: Yes, I did.

Q: And do you remember if you had a discussion with me about what could this be about?

A: Yeah. I remember about — sitting in your office about 10 minutes and — when I originally come to see you, and you saying right here is your problem.

Q: So what did I tell you your problem was?

A: You told me I couldn't carry forward those.

Q: In 10 minutes that you came to my office I told you that you couldn't carry

---

[5]Although defense counsel has a duty to avoid improper comments, the proper course is for a prosecutor to object to improper comments by defense counsel and receive a ruling from the court, *Young*, 470 U.S. at 10, 13-14.

forward those —

A:  Absolutely.

Q:  Even though it was on the tax return, gambling losses, I told you you couldn't carry forward gambling losses or winnings; those had to be the same year.

Defendant testified explicitly that his accountant, Henry Lee, had told him he could carry forward gambling income and losses, to show that the failure to report the gambling income was not willful.  To support this defense, defendant testified that, once corrected, he reported his gambling income on his returns for 2001 and 2002, and amended his returns to report gambling income for 1998 and 1999.

In closing argument, however, defense counsel revealed more about his initial meeting with defendant.  Specifically, defense counsel told the jury

it was obvious to me when Jeff came . . . to my office . . . and he showed me the tax return, he showed me a '97 or '98 tax return, there's gambling losses on the return.  Now, no accountant in his right mind puts gambling losses on the return if he doesn't intend to.  And I said, Jeff, where are the winnings to go with these losses.

He said, the accountant didn't say I had to put them on; we're going to carry them forward for five years.  I said, well, you can't carry — I mean, it took 10 minutes to know that.  You can't carry forward if you knew what you were doing, and that was the first time I realized that Henry Lee is incompetent.  The man should not be a CPA.

Defense counsel argued at length that Lee was incompetent and/or intimidated by the IRS, and that the defendant had relied in good faith on the advice he claimed to have gotten from Lee.  Defense counsel personally vouched for defendant's credibility by saying "[Bland] never had a dishonest bone in his body."  Defense counsel also offered his personal opinion

of the defendant, stating: "I don't think Jeff is a rocket scientist. I think he's a hard worker,

and he relies on people for advice on certain things." Finally, defense counsel also asked the

jury to "please believe" him that the defendant did not review the "20-something" page tax

return before signing it.

The prosecutor's challenged comments addressed the defense—good faith reliance

on bad advice from an incompetent accountant—and argued that it was not believable.

Because defense counsel had injected his own credibility into the issue, his arguments invited

comment on his own role in asserting the defense and the accusations of incompetence on

Lee's part. The prosecutor argued in rebuttal that defense counsel

> apparently realized that they had a huge problem. These gambling records
> were going to be conclusive; you didn't report it; what could we possibly say;
> how could we possibly explain that. <u>Then he saw that '98 return . . . and saw
> [gambling] losses on it and started thinking, how can we use that. Just weave
> a story, something we can say.</u>
>
> As Marsha [Lewis] testified to you, it's not unusual for something like
> that to get put on returns. It's a computer program. You've got to check the
> box. Henry Lee testified that it got carried over because it hadn't been
> checked off. He conclusively testified that he had never been told about
> gambling winnings and losses in that year.
>
> . . .
>
> First of all, did he voluntarily give some of the information over, but
> also what you heard was that Special Agent Welch subpoenaed a lot of it.
> [Defense counsel] knew from day one that he could get it, <u>so let's start
> weaving our story, let's start creating a story about some explanation that we
> can defend you at trial</u>. He gave some of it to Special Agent Welch. He had
> to get the rest. If we act like we're playing nice, maybe someday we can stand
> up in court and say we cooperated, I must be innocent. That's exactly what's
> going on here.
>
> And you can see that even further if you look at what happened with the

'98 and '99 tax return. Marsha Lewis testified that she estimated what his winnings or losses were and prepared a 1998 and 1999 amended return, [that] just happened to get filed two weeks before trial, and why was that? It's pretty convenient. It allows him to come up here and stand and say he's trying to do the right thing. He's trying to pay his taxes.

Use your common sense on that one. If you're contacted 2/12/2002, why not contact the casinos? Why not get the win/loss statement? You've heard a lot of people testify that you could get that information. He could have easily amended those returns in 2002. At that point, he was hoping he wasn't going to get indicted. He was hoping that a case wouldn't get brought.

. . . .

There's been no prejudice against them. . . . Just follow the time line in your own head. He gets contacted on this date. He gets some records sent over. Doesn't file an amended tax return until a week before trial, four years later. That shows what's going on here, and that shows how they're trying to set up Mr. Henry from day one.

Henry Lee came in here and testified twice, and you can compare his testimony to that of Mr. Bland and the reasonableness of it, and use your common sense.

Mr. Bland . . . testified that he told Henry Lee certain things. One, I had winnings in 1998 and 1999, and as a consequence of that, apparently Henry Lee, . . . came back and said, don't report it; you can carry it over five years. And carrying it over five years is significant. That would be 1998, and again that's kind of convenient. It just happens to be roughly around when he visited [defense counsel]. So that way they'd have an excuse. They could say he was going to pay apparently, that, yeah, he was just waiting at the very end to see what happened.

But look at the amount that he supposedly filed – he paid that year; $110,000. If he was really carrying forward or carrying backward of whatever they're saying, how does that account for the million dollars of winnings? It doesn't. That was . . . their attempt to create this story and to try to weave this defense, and it falls short; and where you see it falling short most is the most ridiculous thing he said in his testimony: I told Mr. Lee that I wanted to file and pay these taxes, and he said, you're crazy; if you pay those, I'm going to fire you as a client.

. . . .

. . . [I]n deciding the question of willfulness, you're ultimately going to have to weigh Mr. Lee's testimony versus his testimony and <u>look at everything involved and look at when this story of carrying forward and carrying back was created, apparently created in conjunction with his attorney</u>, and how it played out through time; filed an amended tax return not then, not Mr. Honest Jeff Bland when he first got contacted; he waits [until] a week and a half before trial because his attorney tells him to do it. This is going to look good. We'll say you paid that. We can criticize the government now because they didn't contact you earlier and ask you to pay it.

He could have paid it a long, long time ago, and that just simply shows <u>the story they're attempting to weave</u>. We believe there's no doubt that the evidence we have presented to you will show and does show that he is guilty of this, that he willfully knew about it, a million dollars is not on your tax return, he didn't report. . . . We ask you to find him guilty, because the evidence has proven that he is guilty.

(Emphasis added.)

The remarks, while not isolated or accidental, were less an attack on defense counsel personally and more a response to the arguments linking defense counsel's credibility to the defendant's good faith defense. In fact, the prosecutor emphasized to the jury that to decide the issue they would have to weigh the defendant's testimony against the testimony from Lee. As for the final factor, we agree with the government that the evidence against the defendant was strong. The defendant reported gambling income for 1994 and 1995, but did not report any gambling income for two years in which he had over $1 million in gambling-related deposits and during which defendant's own expert found he had substantial *net* gambling income of more than $400,000. The evidence left plenty of room for the jury to disbelieve defendant's claim that he signed the 1998 and 1999 returns in the good faith belief that the gambling income and losses could be carried forward over a five-year period. While, as the

government concedes, the prosecutor should have avoided accusing defense counsel of concocting a story to lay the blame on bad advice from the accountant, defendant has not shown that the error was so flagrant as to constitute plain error.

**AFFIRMED.**