NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0545n.06

No. 08-2104

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 25, 2010**
LEONARD GREEN, Clerk

TODD LUTZE,

      Petitioner-Appellant,

v.

JERI-ANN SHERRY,

      Respondent-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

/

OPINION

BEFORE:    CLAY, ROGERS, and COOK, Circuit Judges.

**CLAY, Circuit Judge.**  Petitioner Todd Lutze appeals the denial of his petition for habeas

corpus made pursuant to 28 U.S.C. § 2254.  Petitioner argues in his habeas petition that he did not

receive constitutionally effective assistance of trial or appellate counsel and that the state committed

prosecutorial misconduct in violation of his due process rights.  For the following reasons, the

district court's judgment denying the petition is **AFFIRMED**.

**BACKGROUND**

A.    **Procedural History**

Following a jury trial, Petitioner was convicted of felony murder and first degree child abuse

on December 8, 2000 for the death of his girlfriend's seventeen-month-old child.  Petitioner was

sentenced to a mandatory life sentence with no opportunity for parole.  On direct appeal, Petitioner

raised four claims, including prosecutorial misconduct, but he did not argue that his trial counsel

provided ineffective assistance. The Michigan Court of Appeals vacated Petitioner's child abuse conviction on double jeopardy grounds but affirmed both his conviction and sentence for felony murder. The Michigan Supreme Court denied leave to appeal.

Petitioner subsequently filed a motion for relief from judgment which alleged ineffective assistance of both trial and appellate counsel, challenged Shaken Baby Syndrome ("SBS") evidence as "junk science," claimed that the evidence of felony murder was insufficient, and argued that the felony murder statute was unconstitutionally vague. The trial court denied the motion, and the Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal.

Petitioner then filed a habeas claim in district court pursuant to 28 U.S.C. § 2254. The federal habeas petition raised nine grounds for relief. The petition was denied. *Lutze v. Sherry*, No. 07-11227, 2008 WL 2397640 (E.D. Mich. June 11, 2008). A certificate of appealability was granted on Petitioner's claim of prosecutorial misconduct, his claim of ineffective trial and appellate counsel, and his claim challenging the SBS evidence. Petitioner filed a timely appeal to this Court pursuant to 28 U.S.C. § 2253.

**B.      Factual History**

Petitioner was dating Amy Barnette and living with her and her seventeen-month-old daughter, Lydia Aris. On July 14, 2000, Barnette went to work before 5:30 a.m., leaving Lydia in Petitioner's care. Barnette testified that Lydia was behaving normally that morning. She further testified that between 7:30 and 8:00 a.m., Petitioner called her at work looking for Lydia's diapers; Petitioner denies making this call. Petitioner did call before 10:00 a.m. telling Barnette to come home because something was wrong. Petitioner asserts that he had recently awoken at that point. When Barnette arrived at her house, she found Lydia not moving or breathing. Barnette called 911,

2

and Petitioner left before the ambulance arrived. Lydia was rushed to the hospital in a coma and subsequently died.

At trial, testimony was presented both from doctors who evaluated Lydia before her death and from a pathologist who conducted an autopsy. The medical evidence was overwhelming that Lydia had been abused. She had retinal hemorrhages and multiple bruises and suffered from subdural hemorrhaging and hematoma. The pathologist confirmed that she also had bruises on her upper arm that were consistent with adult hand prints in a manner suggesting she was shaken. The injuries were also consistent with blunt force trauma.

At trial, Petitioner's theory was that the injuries had occurred before he started taking care of Lydia on the morning of her death. For support, he called Dr. Laurence Simson, a board-certified forensic pathologist, to elicit testimony that extended the window of time when the abuse could have happened to trigger the subsequent coma. Petitioner testified that he was sleeping until around 10:00 and that when he woke up to give Lydia a bottle, she was non-responsive. Simson agreed with the prosecution's witnesses that Lydia died from a combination of being shaken and blunt force trauma. Petitioner's theory was that other people had abused Lydia, most likely Barnette, who had made some inconsistent statements to the police and doctors.

Petitioner was nonetheless convicted of felony murder and child abuse. Beginning with his motions for post-conviction relief in the Michigan courts, he began to attack the entire theory of SBS. His trial counsel had written a letter to his appellate counsel and had enclosed an email that dealt with challenging the science of SBS. Trial counsel stated that: "Unfortunately I wasn't aware of any expert that was willing to do that. Most of the doctors that I consulted with believed the contrary." (Appx. 140). Despite this advice from Petitioner's trial counsel, Petitioner's appellate

3

counsel did not raise the issue. In post-conviction proceedings, Petitioner included the views of Dr. Ronald Uscinski. who wrote in a letter that shaking did not play a role in the death of Lydia and that her death could have been caused by injuries sustained the night before. (Appx. 127-29).

## DISCUSSION

"In a habeas corpus proceeding, this Court reviews a district court's legal conclusions de novo and its factual findings for clear error." *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009) (citations and quotations omitted). Petitioner's habeas petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "We have stressed that clearly established law under the Act encompasses more than just bright-line rules laid down by the Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." *Goff v. Bagley*, 601 F.3d 445, 456 (6th Cir. 2010) (citations and quotations omitted). We review *de novo* a district court's decision to grant or deny habeas relief and review its factual findings for clear error. *Robinson v. Mills*, 592 F.3d 730, 734 (6th Cir. 2010).

4

## A.      Ineffective Assistance of Counsel

Petitioner's first argument is that he received constitutionally ineffective assistance of counsel in the appellate phase based on his appellate counsel's failure to raise trial counsel's failure to challenge SBS evidence.  Petitioner had a constitutional right to counsel on his first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). In considering whether the assistance of counsel was constitutionally ineffective, we apply the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, in order for Petitioner to show that counsel's performance was so deficient as to deprive him of his Sixth and Fourteenth Amendment rights, he must show: (1) that counsel's performance was objectively deficient; and (2) prejudice, which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694.

Petitioner's ineffective assistance of appellate counsel claim is based on his belief that appellate counsel's decision not to raise his trial counsel's admitted failure to challenge the SBS evidence was constitutionally ineffective.  The heart of Petitioner's claim is the unsworn letter provided by Dr. Uscinski.  The letter is two pages long and states that, in the doctor's opinion, "shaking played no role in this child's injuries." (Appx. 127-28).  The doctor's letter theorizes that trauma suffered the night before could have contributed to Lydia's death, particularly if there was a subsequent fall the following morning.[1]  He further theorized that the brain contusions witnessed

---

[1] In briefing before this Court, Petitioner makes much of an alleged incident the night before when Lydia fell out of the child seat in her car.  It is far from certain that such a fall could cause significant damage, but even under Dr. Uscinski's theory, a previous head injury combined with a "later fall" of even a short distance could cause problems.  No evidence was presented that Lydia suffered any fall before she was in Petitioner's care, starting at 5:30 the morning of her death.  Testimony was presented by two witnesses that Petitioner had told them that he had accidentally dropped Lydia earlier in the morning, but Petitioner did not mention any such incident in his own

in the autopsy were the result of the child having spent a day on a respirator. If a brain dead person is maintained on artificial ventilation, "the brain itself begins to undergo autolysis, or literally, breaking apart, as was seen on this autopsy." *Id*.

The district court acknowledged that "there appears to be some debate in the scientific community . . . as to the injuries necessary to support a theory of SBS." (Appx. 1674). Petitioner, however, argues that the "debate is not about the injuries necessary to support the theory, the debate concerns the scientific basis for the theory." (Pet. Br. 18). Petitioner then proceeds to cite a variety of news and law review articles that question shaken baby syndrome and argues that it was ineffective for his trial counsel not to challenge the underlying science of SBS. Crucially, all of the articles date from 2003 or later. Petitioner's trial was in 2000. In all his submissions, the only evidence he has that SBS was questioned before 2000 was an allusion in Dr. Uscinski's letter to a 1987 study that found that "force necessary to disrupt intracranial tissue cannot be achieved by manual shaking of a child." (Appx. 127). The scientific consensus at the time of the trial was that SBS was a valid theory. Even one of the law review notes relied on by Petitioner, and written in 2003, states: "Even though the syndrome is *almost universally accepted*, the scientific underpinnings are surprisingly weak." Lyons, "Shaken Baby Syndrome: A Questionable Scientific Syndrome and a Dangerous Legal Concept," 2003 Utah L. Rev. 1109 (emphasis added). The Lyons article explores the history of SBS. It cites two primary articles that call into question the validity of SBS. One was a 2001 study of infant brains. The second is a paper by Dr. Uscinski himself published in 2002.

As a preliminary matter, therefore, it was hardly ineffective assistance for Petitioner's appellate counsel not to challenge trial counsel's failure to anticipate a coming wave of scientific testimony.

6

research questioning the validity of SBS. An attorney with a client accused of killing an infant through SBS today, depending on the facts of the case, might have a duty to challenge the validity of the science. Petitioner has provided no evidence that in 2000, when Petitioner's trial counsel was preparing his case, the validity of SBS was being actively challenged in the scientific world.[2] Petitioner's trial counsel simply did not have the scientific support to make a reasoned challenge to the admission of SBS evidence at trial. Petitioner's appellate counsel was therefore not ineffective for declining to raise the issue on appeal.

Even assuming that Petitioner's counsel could have been aware of the questions arising about the soundness of SBS, the petition should be denied. The record plainly supports a finding that even if the underlying scientific foundation of SBS had been challenged, Petitioner could not show "a reasonable probability that . . . the result of [the trial] would have been different." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). The challenges to the scientific underpinnings of SBS center on other, natural explanations for brain injuries that are often attributed to shaking. Here, however, the diagnosis was not based solely on the brain injuries. The testimony of the pathologists indicated that Lydia was "shaken and beaten," not merely shaken. Bruises on Lydia's arms suggested that an adult had gripped her, either to shake her or to slam her against an object. The pathologist who performed the autopsy testified that Lydia's injuries were consistent with blunt force trauma, such as being thrown against another object

---

[2]At oral argument, Petitioner's attorney repeatedly referred to the Louise Woodward case, where an English au pair was convicted in 1997 of second-degree murder based on a shaken baby syndrome theory. SBS' rise to prominence in the Woodward and other cases may have presaged the skepticism of SBS evinced in the literature provided by Petitioner, but nothing provided by Petitioner indicates that, at the time of his trial, his attorney could have credibly challenged the underpinnings of SBS.

or receiving blows to the head in addition to being shaken and beaten. The unsworn, two-page letter from Dr. Uscinski is insufficient to undermine the ample testimony provided at trial demonstrating the severity of Lydia's abuse that extended well beyond being shaken.[3]

Furthermore, Petitioner has a massive problem with timing. Petitioner was in charge of Lydia starting at 5:30 a.m. Whether Lydia was killed by shaking, falling, or being beaten, if Petitioner were innocent, the injuries had to occur earlier than 5:30 a.m. Petitioner's counsel put on a board-certified forensic pathologist to posit a theory that the injuries could have occurred earlier, evidence that the jury appears to have rejected. The entire defense was premised on the possibility that the injuries occurred before Barnette left for work, and some of the evidence was compelling. Even if the jury improperly believed that SBS was the cause of death, it still could have believed that the abuse took place before 5:30 in the morning, with manifestations appearing later in the day.

All told, the evidence strongly supported a theory that a) due to the bruises on the arm, the violence was purposefully inflicted and that b) the child was beaten or thrown against another object. The real question for the jury was when those injuries occurred because if they occurred after 5:30 in the morning, Petitioner must have inflicted them. These determinations were made based on evidence other than that pertaining to SBS, supporting the state trial court's determination that Petitioner had not "established that but for the alleged erroneous admission of testimony about SBS . . . he would have had a reasonably likely chance of acquittal." (Doc. 14-8 at 28). This conclusion

---

[3]For much the same reason, Petitioner is not entitled to the evidentiary hearing he repeatedly requests in his appellate brief. Even if Petitioner could establish at such a hearing that counsel performed deficiently by failing to challenge the scientific underpinnings of SBS, Petitioner still could not establish prejudice in light of the other evidence that Lydia was abused. We therefore deny Petitioner's requests for a remand for an evidentiary hearing on his ineffective assistance of counsel claims.

by the state court was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. *See Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009).

**B.     Prosecutorial Misconduct**

Petitioner's second challenge is that several statements made throughout his trial represent prosecutorial misconduct. This Court has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001); *see Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (utilizing this test to evaluate a due process claim based upon prosecutorial misconduct raised in a post-AEDPA habeas petition). First, we must consider whether the prosecutor's conduct and remarks were improper. *Id*. If we conclude that the remarks were improper, then we must apply the four-factor test set forth in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir.1994), to determine "whether the impropriety was flagrant" and thus violated the defendant's due process rights. *Carter*, 236 F.3d at 783. The four factors are as follows: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id*.

Petitioner makes a number of challenges to isolated statements throughout his trial. In effect, Petitioner makes two substantive claims of misconduct.[4] First, he argues that the prosecutor

---

[4]Petitioner also mentions a number of other statements made by the prosecutor throughout the trial but fails to develop any argument as to why those statements violated his due process rights. To the extent Petitioner argues that these other examples combined with the statements discussed below reach the level of prosecutorial misconduct, we reject that argument.

repeatedly elicited evidence of Petitioner's prior arrests, thereby improperly prejudicing Petitioner. Second, he challenges the prosecutor's statement in closing argument that Petitioner had called Lydia a "little bitch," which was not supported by the evidence.

Initially, in direct examination of an investigating officer, Detective Santa, the prosecutor elicited testimony about focusing the investigation on Petitioner. Then, the prosecutor asked:

> Q: Did you continue investigation[sic]?
> A: Yes, sir, we did.
> Q: All right. And what did you do?
> A: Um – We did a background check. We ran the suspect's name through our computer files – ah – found that he had been – been –

At that point, the court interrupted to stop the testimony, and what was found in the background check was never shared with the jury.

During the direct examination of Barnette, the prosecutor asked about an incident where Petitioner had asked Barnette to move out. In response, Barnette testified: "He said that his wife wanted to get back with him and he didn't want to see her kill herself, so he wanted to get back with her, so she wouldn't kill herself and would help pay off his credit card bill, and to keep him from goin' to jail." (Appx. 590-91). The prosecutor did not follow up on why Petitioner would possibly go to jail. Subsequently, the prosecutor attempted to isolate the time when Barnette alleged that she saw bruising on Lydia's back. The prosecutor asked how long before Lydia died had this occurred. Barnette responded: "It was after he got out of jail." (Appx. 1209). The prosecutor replied: "Well, can't talk about that, okay. How long before Lydia died did this happen?" *Id*.

The state appellate court found that "the prosecutor's questions to the witnesses were not calculated at eliciting the responses regarding defendant's prior record or criminal past." *People v. Lutze*, No. 232430, 2003 WL 21224031 at *3 (Mich. Ct. App. May 27, 2003) (unpublished). This

10

determination was not unreasonable. The questions were completely neutral, not suggesting any sort of response by the witness. Obviously through pre-testimony preparation, it is possible for a lawyer to ask a neutral question to intentionally elicit an improper comment from the witness. However, the parties have pointed out, and we have independently found, no case where seemingly neutral questions by a prosecutor have been found to constitute prosecutorial misconduct based on the answers provided by a witness, much less a case where a state court's determination that a neutral question was not prosecutorial misconduct has been found to be unreasonable.

In *Smith v. Mitchell*, 567 F.3d 246 (6th Cir. 2009), the prosecutor in state court proceedings asked a series of troubling questions on cross-examination of the defendant. Included was a question that asked what kind of sounds the victim "made when you ripped his throat from ear to ear." *Id*. at 256. The Court on habeas review under AEDPA found that no prosecutorial misconduct occurred because the comments "were isolated, do not seem to have been purposeful, and any prejudice was slight . . . Further, the evidence against [petitioner] . . . was very strong." *Id*. In this case, the statements were similarly isolated and not purposeful. The statements were potentially prejudicial by implying that Petitioner had some sort of criminal record, but the jury never found out why he had been in jail. Finally, the evidence against Petitioner was strong. Lydia was unquestionably under Petitioner's sole control for several hours before she died. At trial, Petitioner's best medical evidence suggested only that it was possible that the injuries could have occurred earlier. Both the treating physician and the doctor who performed the autopsy testified that the injuries had to have been inflicted only during a time frame when Petitioner had sole control over Lydia. Petitioner also behaved somewhat oddly following Lydia's hospitalization, leaving the house and attempting to avoid contact rather than being forthright with police and medical personnel.

11

More troubling is the prosecutor's reference to Petitioner's allegedly referring to Lydia as a "little bitch." In cross-examination of Lutze, the prosecutor asked if Petitioner had ever called her "a little bitch." Petitioner denied that he had ever called her that. In closing argument, the prosecutor again stated that Petitioner had called her "a little bitch." (Appx. 1553). Petitioner's counsel immediately objected to the comment, and the objection was sustained.

The state appellate court agreed that the comment was "improper because there was no evidence that defendant made the statement." *People v. Lutze*, 2003 WL 21224031 at *3. The state appellate court excused the prosecutorial misconduct because "defendant immediately objected to the erroneous remark and the trial court sustained the objection and instructed the jury to disregard the remark. The court's instruction was sufficient to cure any error." *Id*. The state appellate court appears to be incorrect that any formal instruction was given. The trial judge stated: "I think I'll ask you to strike that oral – argument and move to another area." (Appx. 1553). The trial court did, in its final instructions, however, instruct the jury not to consider any testimony that was stricken and that the lawyers' statements were not evidence. (Appx. 1613-14).

The statement was assuredly improper because it was prejudicial and had no support in the record. However, the isolated statement was not "flagrant" as that word is defined in our prosecutorial misconduct precedents. The Court considers four factors in determining whether alleged prosecutorial misconduct was flagrant: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Carter*, 236 F.3d at 783. In this case, the first prong weighs in favor of Petitioner because the statement was clearly prejudicial. The third

12

prong is a close call because the state undoubtedly made the allegation on purpose, but it is unclear that the state realized it was not supported by the evidence. In response to opposing counsel's objection, the prosecutor immediately responded that the statement was included to "show[] his state of mind." (Appx. 1553). The prosecutor then stated that he believed there were facts in evidence to support it. Therefore, it is unclear whether the prosecutor intentionally said something he knew was not in evidence.

The other two prongs, however, weigh in favor of Respondent. First, the comment was isolated. Second, as stated above, the evidence against Petitioner presented at trial was strong. Petitioner cites no cases finding prosecutorial misconduct based on one isolated comment. The statement was undoubtedly improper, but the conduct did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *See also*, *Goff v. Bagley*, 601 F.3d 445, 480-81 (6th Cir. 2010) (finding improper statements by prosecutor during closing arguments not flagrant where "the remarks were isolated, and there was substantial evidence before the jury. . ."). These isolated comments simply did not rise to the necessary level that would constitute a denial of Petitioner's due process rights under *de novo* review, much less rise to the necessary level to overcome the deference afforded a state court decision under AEDPA. We therefore conclude that the state court's "decision on this issue is not contrary to, or an unreasonable application of, federal law." *Goff*, 601 F.3d at 481.

## CONCLUSION

For the foregoing reasons, the district court's judgment denying the writ of habeas corpus is **AFFIRMED**.