NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0602n.06

Nos. 17-3935/4075

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 30, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| DAVID MCSHAN (17-3935), and | ) | OHIO |
| FREDERICK ALLEN MCSHAN (17-4075), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: MERRITT, COOK, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. A jury convicted Frederick McShan and his brother David McShan of possession with intent to distribute heroin, as well as conspiracy to do the same. The jury also convicted Frederick of money laundering. In Frederick's case, the district court misspoke when reading aloud the jury's verdict, mistakenly omitting a zero from the jury's written determination that Frederick's crime had involved "1000 grams or more of heroin." Frederick appeals, arguing that the district court lacked authority to re-poll the jury to correct this error, after it had been "discharged," but before the jurors had dispersed. He also appeals the district court's failure to grant his motion to sever. David appeals on grounds that the prosecutor's opening remarks, and various statements during trial, amounted to prosecutorial misconduct, and that the district court erred by using acquitted conduct to calculate his sentence. Having considered the arguments raised by the parties, we AFFIRM the judgment of the district court.

I.

A grand jury indicted Frederick and David McShan along with five co-defendants on charges arising from their participation in a heroin-trafficking organization. Using surveillance, GPS tracking, and a confidential informant, law enforcement officials identified Frederick as the leader of the organization, which operated in Steubenville, Ohio, and obtained its supply from a contact in Chicago, Illinois. David, along with others, distributed heroin and collected proceeds on Frederick's behalf. For these deeds, Frederick and David faced several charges, including conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841 and 846 and possession with intent to distribute heroin in violation of 21 U.S.C. § 841. Frederick was also charged with eleven additional counts of possession with intent to distribute heroin in violation of 21 U.S.C. § 841 and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956.

Following a five-day trial, the jury found Frederick and David guilty of all charges. The district court announced the verdicts in open court, specifically stating, "On Special Verdict Form No. 1, having found . . . Frederick . . . guilty of the charge of conspiring to possess with intent to distribute heroin, We, the Jury, find, check one, *100 grams or more* of heroin." (Emphasis added.) As to Special Verdict Form 2A, the court recited, "[H]aving found . . . David . . . guilty of the charge of conspiring to distribute heroin, We, the Jury, do unanimously find beyond a reasonable doubt the conspiracy involved a quantity of, and the box that is marked is *less than 100 grams* of heroin." (Emphasis added.) The district court then proceeded to poll the jury. Thereafter, the jury was excused (4:50 p.m.) and asked to wait in the jury room, so the judge could personally thank the jurors for their service. The court had been in recess for 14 minutes (4:51 p.m. to 5:05 p.m.) when the jury was asked to return to the courtroom. Once the jury was reassembled in the

courtroom, the district judge explained that the "jurors were taken directly from the courtroom to the adjoining jury room." And when the judge addressed the jurors, "an inquiry was made regarding the amount set forth in the verdict—Special Verdict Form No. 1A," which pertained to Frederick. The district judge then acknowledged: "It appears that I have misread in open court what is actually very clear on the verdict form filled in by the jury and I want to reread this into the record." The judge then reread the special verdict forms for David and Frederick, according to which the jury had found David guilty of conspiring to possess with intent to distribute *less than* 100 grams of heroin (no change) and had found Frederick guilty of conspiring to possess with intent to distribute *1000 grams or more* of heroin, not 100 grams or more, as the judge had previously, but mistakenly, read. The court then re-polled the jury, which gave its assent. David objected to the re-polling while Frederick, who now challenges the jury re-polling, simply asked the court to clarify that defense counsel had not been present when the judge spoke with the jury in the jury room.

Frederick was ultimately sentenced to concurrent sentences of twenty-four years for conspiracy to possess with intent to distribute heroin, twenty years for the remaining counts, and five years of supervised release for conspiracy to possess with intent to distribute heroin and the remaining counts. David was sentenced to concurrent sentences of seventy-four months in prison and eight years of supervised release. Both Frederick and David appeal.

II.    Frederick McShan's Appeal

Frederick makes two claims on appeal: that the district court lacked authority to re-poll the jury regarding the verdict and that the district court abused its discretion by not severing his trial from David's.

A. Re-polling the Jury

Frederick argues that the district court abused its discretion when it re-polled the jury after discovering its mistake in announcing the jury's verdict (reading 100 grams instead of 1000 grams of heroin). We disagree.

Federal Rule of Criminal Procedure 31(d) speaks to the polling of a criminal jury. It states:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Although Frederick's appellate brief asserts that the trial court violated this rule, he makes no real argument to that effect. As we see it, the rule does not quite speak to the situation presented here. Rule 31(d) surely governs when a court may or must poll the jury the first time; but we see nothing in the rule that addresses when a judge may poll a jury a second time, to correct an error in the first. Therefore, any authority the district court had must have come from its inherent powers.

The parties do not dispute that, generally speaking, federal district courts have the inherent authority to re-poll a jury to correct an error in reading the verdict. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1891–93 (2016). They do dispute whether the district court's exercise of that power was appropriate in this case.

The common law rule was that once the judge discharged a jury, the jury could not be re-called to amend its verdict. *Dietz*, 136 S. Ct. at 1897 (Thomas, J., dissenting) (describing the common law rule). But, as Frederick acknowledges, it was "well-settled that a trial court merely using the word 'discharged' d[id] not negate the court's power to reconvene a jury." Appellant Frederick McShan Br. at 9 (citing *United States v. Rojas*, 617 F.3d 669 (2d Cir. 2010) and *Summers v. United States*, 11 F.2d 583 (4th Cir. 1926)). As the rule was described in *Summers*:

> [A jury] may remain undischarged and retain its functions, though discharge may have been spoken by the court, if, after such announcement, it remains an undispersed unit, within [the] control of the court, with no opportunity to mingle with or discuss the case with others, and particularly where, as here, the very case upon which it has been impaneled is still under discussion by the court, without the intervention of any other business.

*Summers*, 11 F.2d at 586.

In *Dietz*, the Supreme Court rejected this test for civil cases, adopting instead a multi-factored "inquiry focused on potential prejudice." *Dietz*, 136 S. Ct. at 1896. But *Dietz* cautioned that its "recognition . . . of a court's inherent power to recall a jury is limited to civil cases only. Given additional concerns in criminal cases, such as attachment of the double jeopardy bar, we do not address here whether it would be appropriate to recall a jury after discharge in a criminal case." *Id.* at 1895. It is thus unclear whether *Dietz* meant to leave in place the common law rule in criminal cases, or whether, absent double-jeopardy concerns,[1] *Dietz*'s potential prejudice rule should apply. Under either test, we have no difficulty concluding that there was no error here.

In *Rojas*, the Second Circuit adopted the common law rule set forth in *Summers*. *Rojas*, 617 F.3d at 677 (quoting *Summers*, 11 F.2d at 586). Applying this rule, the court in *Rojas* found it "significant" that, while the jury in that case "had technically been declared 'discharged' by the court, it had not dispersed. The jurors were therefore not exposed to 'outside factors,' which might 'render[] the reliability of any poll on recall problematic.'" *Rojas*, 617 F.3d at 678 (quoting *United States v. Marinari*, 32 F.3d 1209, 1213 (7th Cir. 1994)). The court held that, under those

---

[1] Frederick makes no meaningful double jeopardy argument. Although he fleetingly asserts that the trial court's re-polling of the jury violated his right against double jeopardy, he does nothing to develop the argument. He merely declares, without argument or citation, "that double jeopardy does in fact attach and the defendant-appellant can only be subjected to the penalties which he faced at the time of the original polling of the jury." This will not do. Under this court's caselaw, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" are forfeited. *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996).

circumstances, the jury "'retain[ed] its function[],' and that it was proper to return it to the courtroom for a re-reading of the verdict form and for a re-polling." *Rojas*, 617 F.3d at 678 (internal citation omitted and alteration in original).

This case is *Rojas*'s twin. In *Rojas,* a courtroom deputy, reading aloud the jury's written verdict, mistakenly omitted the word "base" and instead stated that the jury had found the defendant guilty of a conspiracy involving distribution of "five grams or more of a mixture and substance containing a detectable amount of *cocaine*." *Id.* at 673. The jury was then polled, discharged, and returned to the deliberation room to await the thanks of the court. *Id.* While the jury waited, counsel alerted the judge to the mistake. *Id.* Over defense counsel's objection, the jurors were reassembled, provided with an explanation of the error, re-read the verdict form, and re-polled. *Id.* The jurors gave their assent to the correct reading of the verdict. *Id.*

The Second Circuit found no error:

> [N]otwithstanding the fact that the jury assented to the improperly read verdict form when polled for the first time, the initial misreading of the written verdict form in no way calls into doubt our conclusion that the actual verdict reached by the jury is reflected in the written form. Nor does the recitation error leave us with any uncertainty that the written verdict form reflects an uncoerced and unanimous jury verdict.

*Id.* at 677. We reach the same conclusion.

As in *Rojas*, this case involves a misstatement of the verdict, caught after the judge pronounced the jury "discharged" but before the jurors had left the deliberation room. The judge explained, on the record, that the jurors "were taken directly from the courtroom to the adjoining jury room." The delay between discharge and recall—fourteen minutes here, six minutes in *Rojas*—was brief. And there is no evidence that the jurors left the deliberation room or had the opportunity to "mingle" with or speak to anyone, other than the judge, after being discharged. Indeed, the judge explained at sidebar that the jurors "ha[d]n't talked to anybody but [him]."

When the jury returned, it was not to deliberate anew, but merely to correct an error in the court's recitation of their written verdict. We have little trouble concluding that this jury "remain[ed] an undispersed unit, within [the] control of the court." *Summers*, 11 F.2d at 586. Applying the common law rule, the district court did not err in recalling the jurors to correct an inadvertent error in the recitation of the jury's written verdict.

The parties focus their attention on *Dietz*. Applying the factors found relevant in that case leads to the same result. There is no evidence that "any juror [was] directly tainted." *Dietz*, 136 S. Ct. at 1894. As mentioned above, only fourteen minutes separated "discharge and recall."[2] *Id.* There is no evidence that the jurors "spoke[] to anyone about the case after the discharge," other than the judge. *Id.* Nor is there any indication of an emotional reaction to the verdict by the defendants or those in the gallery; and the jurors here never made it to the "corridors" to witness any other reaction. *Id.* Finally, nothing on the record reflects any access to "smartphones or the internet." *Id.* at 1895.

Frederick suggests, however, that while at common law the court's control was considered the guardian against improper jury influence, here it might have been the problem. He implies, without substantiation, that the district judge might have exerted influence over the jurors in an effort to get them to change their verdict. The allegation is untenable. We draw once again on *Rojas*. To believe, as Frederick would have us do, that during the first poll:

> the jury agreed with the [court's] mistaken reading of the verdict, rather than the jury's written verdict, requires us to assume that the jurors unanimously changed their minds in a split second . . . . It is unreasonable to expect the jurors to have corrected the [court's] misreading of their verdict and to conclude that by their failure to do so [they had] assented to the misread verdict.

---

[2] Although we do not know how long the jury had been discharged in *Dietz* (the court described the interval as "a few minutes"), we suspect the interval was longer than here because in *Dietz*, "one juror may have left the courthouse, apparently to retrieve a hotel receipt." *Dietz*, 136 S. Ct. at 1895.

*Rojas*, 617 F.3d at 679 (last alteration in original) (quoting *United States v. Boone,* 951 F.2d 1526, 1532 (9th Cir. 1991)). "While it is true that a juror has a right, 'when polled, to dissent from a verdict to which he [or she] has agreed in the jury room,' there is no suggestion that any one of the jurors in fact dissented from the written verdict form." *Id.* (internal citation omitted). But Frederick would have us believe not only this, but that, having instantly and unanimously decided to renounce their written verdict in the courtroom, the jurors again quickly, unanimously, and without remark did a second about-face, in response to some unsubstantiated pressure or information delivered in the jury room. The narrative strains credulity.

We do not presume that a jury is tainted. *See United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) ("[T]he burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed."). *See also Smith v. Phillips*, 455 U.S. 209, 215–16 (1982). Much less will we casually assume that the district judge supplied some unspecified taint. Nothing in *Dietz* changed that rule. *See Dietz*, 136 S. Ct. at 1895 (evaluating potential for prejudice based on the record of the proceedings). Frederick's counsel did not ask, when the jurors were re-polled, that they be questioned about any communications or other outside influence in the jury room and nothing on the record supports the claim. Under these circumstances, we have no grounds to find real or potential prejudice.

Here a district judge misspoke when reading aloud what was clearly written on the jury form. As the Supreme Court noted in *Dietz,* "[a]ll judges make mistakes." *Id.* at 1896. This judge made reasonable efforts to correct that mistake and Frederick can point to no prejudice therefrom. We find no error in recalling the jury here, whether under the common law or under the test set out in *Dietz*.

B.  Denial of Motion to Sever

Frederick next challenges the district court's decision not to sever his trial from David's. "The decision to deny a motion for severance and separate trial rests within the wide discretion of the district court and will not be reversed absent an abuse of discretion." *United States v. Long*, 190 F.3d 471, 476 (6th Cir. 1999).  The federal system generally favors joint trials for defendants who are indicted together to promote efficiency and avoid "the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  Defendants are not entitled to severance simply because they might have a better chance at acquittal if tried separately.  *Id.* at 540.  Trials properly joined under Fed. R. Crim. P. 8(b), should be severed under Fed. R. Crim. P. 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Frederick's treatment of this claim in his opening brief is so perfunctory that we might consider it forfeited.  *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) (explaining that an appellant forfeits "issues not raised and argued in its initial brief on appeal" and "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (citations omitted)).  After reciting the language of Fed. R. Crim. P. 8(b) and Fed. R. Crim. P. 14(a), Frederick states only that, when the trial began, "counsel for co-defendant, David McShan, immediately began to [sic] only logical defense on behalf of this client and that was pointing the finger of guilt at [Frederick].  Once this defense was realized by [Frederick]'s trial counsel, a motion to sever was made."  Frederick has failed to develop any meaningful argument, let alone one that shows "compelling, specific, and actual prejudice from [the] court's refusal to

grant the motion to sever." *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (alteration

in original) (quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005)).

But even if this argument were not considered forfeited, it would fail on the merits. Before

voir dire, counsel for David and Frederick were "satisfied that no antagonistic approach would be

taken by [opposing] counsel." According to his severance motion filed in the trial court, Frederick

realized during voir dire, that David was pursuing an antagonistic defense. Frederick complained,

in particular, that David's having told the jury that David was in custody would cause the jury to

believe that Frederick, his allegedly more culpable coconspirator, was also in custody. This,

Frederick claimed, deprived him of due process and the presumption of innocence. Frederick also

argued that he was prejudiced by David's counsel having made remarks that portrayed the

McShans as a crime family.

But following voir dire, the district court instructed the jury that "the fact that [David] may

be in custody is not to be considered when you decide whether or not the government has proven

the case beyond a reasonable doubt . . . . And, likewise, the length of time has have [sic] no bearing

on how you decide this case. Instead, it will be from the facts presented at the trial." When asked

whether he would like a further limiting instruction, Frederick's counsel declined, on the ground

that "the limiting instruction that came after voir dire was satisfactory to the defense, and [he

would] prefer not to remind the jury about it again."

Later, although the district court acknowledged, early in the trial, that "a piece of the

defense . . . is antagonistic," the court determined that it was not sufficiently so to warrant

severance. And when Frederick renewed this same motion at the close of evidence, he provided

no basis to establish that this joint trial subjected him to any legally cognizable prejudice. *See*

*Zafiro*, 506 U.S. at 541. The district court again instructed the jury before deliberation that the

jurors were to "separately consider the evidence against each defendant," and that their "decision on any one defendant or any one charge . . . should not influence [their] decision on any other defendant or any other charge . . . ." We conclude that the district court did not abuse its discretion in denying Frederick's motion to sever.

### III.    David McShan's Appeal

David argues that the prosecutor engaged in misconduct by making improper statements in his opening remarks and improper "insinuations and assertions" calculated to mislead the jury. He also argues that the district court erred when determining his seventy-four-month sentence.

### A.  Prosecutorial Misconduct

David first alleges prosecutorial misconduct. "Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review *de novo*." *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). Because David failed to object during trial to the prosecutor's statements which he now claims were improper, he "bears the burden of showing that [any] prosecutorial conduct in the present case was so 'exceptionally flagrant that it constitutes plain error.'" *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002) (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Therefore, he must establish that (1) an error occurred below; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceeding. *Modena*, 302 F.3d at 630 (quoting *United States v. Schulte*, 264 F.3d 656, 660 (6th Cir. 2001)).

When examining a claim of prosecutorial misconduct, we "view the conduct at issue within the context of the trial as a whole." *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004). We first determine whether the statements at issue were improper. *Carson*, 560 F.3d at 574. If

we determine the statements were improper, we determine whether they were so flagrant as to warrant reversal. *Id.* We consider four factors when determining whether a statement was flagrant: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* (quoting *Carter*, 236 F.3d at 783). We evaluate these four "flagrancy factors" to determine prejudice. *Id.* (citing *Carter*, 236 F.3d at 784).

*The prosecutor's opening statement.* David charges that the prosecutor's opening statement included a number of claims that exaggerated the evidence against David and were "unsupported by direct evidence" or "even by inference." David challenges the following statements:

1. David's "role in this conspiracy was to aid and assist Fred in the distribution of heroin, to carry drug money on behalf of the organization, and to help Fred McShan deal with the heroin supplier in Chicago, Illinois."

2. "[T]here were times when David McShan carried money up to Chicago to deal with Landon Jones . . . ."

3. A "confidential informant [Demetrius Brandon] was purchasing heroin directly from Fred McShan, directly from David McShan, and directly from the other members of the organization."

4. "[I]t ended up being about 187 grams of heroin that law enforcement bought off Mr. McShan, David McShan, and the members of the organization."

5. "Twelve times Demetrius Brandon went and made hand-to-hand drug deals at the direction of law enforcement with Fred, David McShan, and other members of the organization. You're going to hear the testimony from Mr. Brandon about that, hear the recorded phone calls, and see the audio and videos of those deals."

As to these statements, we reject David's claim of misconduct because the statements were supported by the evidence presented at trial or were reasonable inferences drawn therefrom. *See*

*United States v. Cosgrove*, 637 F.3d 646, 663–64 (6th Cir. 2011) (stating that "[a] prosecutor has leeway to argue reasonable inferences from the evidence" (internal quotes omitted)).

First, Demetrius Brandon, the confidential informant, testified regarding his interactions with the McShan brothers and other members of their organization. He testified that he wore a camera or "little audio keys" when going to purchase heroin from "Fred and company." Audio and video recordings of most of these transactions were played for the jury. The transactions, some which were not recorded, included Brandon, Donae Grier (one of Frederick's associates), and the McShan brothers. Brandon testified that during one transaction, David handed him a small bag of heroin, which was wrapped in a white handkerchief or paper towel, after which Frederick accepted payment.

Second, several investigators testified about the confidential informant's heroin purchases from the McShans. FBI Special Agent Drew McConaghy testified that a confidential informant was able to make buys directly from David and Frederick. Michael White, of the DEA, testified that between April and September of 2015, a confidential informant purchased approximately 187 grams of heroin from the McShan drug organization. And Matthew Beatty, a narcotics investigator from the Brook County Sherriff's Office, testified that "prerecorded money was given to [the confidential informant] to purchase heroin off Fred McShan," and this money was later found on David and Frederick.

Third, Landon Jones, a Chicago-based heroin supplier, testified about his interactions with the McShans. Jones, who had grown up with David but had not known Frederick at the time, testified that it was important to his decision to accept Frederick as a client that he knew David and knew he was "a credible person"—"somebody that [he] didn't have to worry about." He testified that he sold Frederick between 300–500 grams of heroin on approximately twelve

occasions. Jones testified that he had met with both McShans in Ohio to recover a debt owed by Frederick and that David had vouched for his brother. Another time, Jones testified that he had delayed a planned drug sale to Frederick in Chicago because he was worried that Frederick might be working with the police. Jones testified that David, who was with Frederick in Chicago, expressed his dissatisfaction with the delay, complaining that Jones was causing the McShans to "miss money." In other words, Jones explained, the McShans had come to Chicago to buy heroin to sell in Ohio and were upset that their plans had been thwarted. Taken as a whole, this evidence amply supports the prosecutor's statements, set forth above, regarding David's role in the conspiracy.

David challenges one further statement made by the prosecutor in his opening remarks: "[Y]ou're going to have the eyewitness testimony of Mr. Brandon as to what happened during those deals, and you're going to have testimony from law enforcement officers who were actually on surveillance and saw those deals during that time."

Although part of this statement was born out by the evidence presented at trial (Brandon did testify "as to what happened during those deals,") both Agent McConaghy and Detective Ellis testified that they did not personally witness David engaging in a narcotics transaction that had taken place on April 30, 2015,[3] and no other testimony in the record suggests that the officers personally witnessed David engaging in any other drug deal.

But not every variance between a prosecutor's description of the evidence during an opening statement and the actual presentation of the evidence to the jury constitutes reversible error. *Frazier v. Cupp*, 394 U.S. 731, 736 (1969). As the Supreme Court has cautioned, "[m]any

---

[3] A previous statement by Agent McConaghy that April 30 "was the first time we had seen David participate in any type of sale of heroin" was stricken from the record.

things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance." *Id.* And here, the trial court gave multiple "proper limiting instruction[s]," *id.*, instructing the jury that the statements, questions and arguments of counsel were not to be considered as evidence in the case. These instructions mitigated any harm that might have flowed from the discrepancy between this remark in the opening statement and the evidence presented at trial. *See id.*; *United States v. Campbell*, 317 F.3d 597, 607 (6th Cir. 2003); *United States v. Burns*, 298 F.3d 523, 543 (6th Cir. 2002).

But even if we were to consider any of the statements David challenges to be improper, we could not find them "so exceptionally flagrant" as to constitute plain error. *Modena*, 302 F. 3d at 635. Indeed, David makes no real attempt to explain how the prosecutor's conduct in this case would rise to that level under this court's caselaw, s*ee Carter*, 236 F.3d at 783 (setting forth four factors used to guide the flagrancy inquiry), except to repeatedly assert that the case against him was "extremely weak." With this we disagree. There was testimony from Brandon, Jones, and multiple investigators indicating that David was involved in the heroin transactions. Brandon testified that David personally handed him heroin on at least one occasion. The prosecutor's remarks in his opening statement did not amount to misconduct, and the district court did not err, plainly or otherwise.

*The prosecutor's questions throughout the trial*. David next argues that on "more than 20" occasions, the prosecutor "elicited improper insinuations and assertions, either in witness' answers to his questions or contained in his questions" by implying that there was an abundance of evidence of David's involvement in the drug operation when, in David's view, there was not.

David first argues that the prosecutor and its witnesses misled the jurors when they "constantly referred to the 'McShan organization,' implying it was both Fred and David McShan's

organization, without evidence of such an arrangement." But much of David's argument is directed at statements made by witnesses, not the prosecutor. For example, David takes issue with Agent McConaghy's reference to the "McShan organization" in response to a question posed by Frederick's counsel on cross-examination. David also points to testimony of Detective Ellis,[4] who stated that David's sale of heroin "links [the heroin] to the organization that Fred and David McShan are working together." We are unaware of any authority that would support a finding of prosecutorial misconduct based on witness statements alone. *See Lutze v. Sherry*, 392 F. App'x 455, 461 (6th Cir. 2010) ("[W]e have independently found, no case where seemingly neutral questions by a prosecutor have been found to constitute prosecutorial misconduct based on the answers provided by a witness . . . ."). David does also criticize the prosecutor for referring to the "McShan organization." We are skeptical of any impropriety, but certain that such a reference could not properly be characterized as "exceptionally flagrant" conduct constituting plain error. *See Modena*, 302 F.3d at 635. And, as before, David does not meaningfully attempt to make that case.

David argues next that the prosecutor asked questions that "exaggerated the importance" of Jones's opinion of David's honesty, thereby, "implying that this opinion was a key factor" in Jones's decision to sell drugs to Frederick. For example, he points to this exchange: The prosecutor asked, "Was it important that you knew David before you went into business with Fred?" Jones responded, "I mean, he was a credible person, his word, you know." The prosecutor then asked, "When you say he, you've got to be more specific" to which Jones responded, "Oh, Dave's word was credible. He was known as a credible person so, yeah, that meant something."

---

[4] Although David's brief references "Agent McConaghy," the record citations refer to the testimony of Detective Ellis.

The prosecutor asked, "And what did it mean to you?" Jones answered, "I guess that he was, you know, he was somebody that I didn't have to worry about." David does not cite any caselaw or otherwise explain why this line of questioning amounted to prosecutorial misconduct, and he registered no objection to that effect below. As stated above, we are unaware of caselaw from our circuit or any other authority that supports a conclusion that eliciting testimony through neutral questions constitutes prosecutorial misconduct. *See Lutze*, 392 F. App'x at 461.

David also claims that the prosecutor asked "vague" questions regarding the significance of events, which led to "blurted statements by law enforcement witness[es] which were not supported by evidence." He also asserts that the prosecutor's colloquy with Agent McConaghy was riddled with "improper insinuations and assertions." David's appellate briefing fails to identify which questions he believes were impermissibly "vague," but it does describe these "[v]ague direct examination questions," as "not in themselves improper." That is sufficient to answer the charge. And as before, most of David's complaints of "vagueness" or "improper insinuations" are directed toward the testimony of government *witnesses*, not at the questioning of the prosecutor. That is insufficient to establish prosecutorial misconduct. *See Lutze*, 392 F. App'x at 461.

Finally, David challenges a statement made by the prosecutor at sentencing. The prosecutor stated that David's possession of prerecorded money, together with Jones's testimony, indicated that both brothers were actively soliciting drugs from Jones; David claims there was "no testimony to that effect." Again, we disagree. First, Officer Beatty testified that he was aware of a September 2015 traffic stop of David and Frederick, which resulted in the seizure of approximately $23,000, $800 of which matched the prerecorded bills that were given to Brandon. Second, Jones testified that David had complained that Jones was causing them to "miss money"

because Frederick and David "didn't have the product to serve their customers." David has failed to meet his burden to show prosecutorial misconduct.[5]

B. Sentence Based on Acquitted Conduct

David's final claim on appeal relates to his within-Guidelines sentence of seventy-four months' imprisonment. He argues that his sentence is procedurally unreasonable because, despite being convicted by a jury of conspiracy to possess with the intent to distribute *less than* 100 grams of heroin, the district court used 230 grams of heroin as relevant conduct to calculate his sentencing range pursuant to U.S.S.G. § 1B1.3. As to the accuracy of the district court's drug quantity determination, we cannot conclude that the district court clearly erred when it determined that David was responsible for 230 grams of heroin. *See United States v. Henley*, 360 F.3d 509, 514–15 (6th Cir. 2004) ("The district court's drug quantity determination 'must stand unless it is clearly erroneous'") (quoting *United States v. Ward*, 69 F.3d 146, 149 (6th Cir. 1995)). The court attributed to David the seven grams of heroin that he was convicted of distributing on April 30, 2015, which was supported by the testimony of the confidential informant. The district court then converted the approximately $23,000 in cash seized from David and Frederick on a return trip from Chicago into equivalent quantities of heroin, after finding that the two were traveling together and had both met with the heroin supplier in Chicago. The district court concluded that "by a preponderance, at least, this amount of money should be treated as relevant conduct." This determination was not clearly erroneous.

---

[5] David also alludes to "false testimony" that he believes Agent McConaghy gave before the grand jury and at a bond hearing regarding whether an April 30 drug transaction had been recorded and observed. But, even if this testimony was false, rather than simply mistaken, David concedes that Agent McConaghy's *trial* testimony was accurate, and the trial testimony on this point was favorable to David.

David does not seriously contest the drug quantity calculation, instead arguing that the Constitution forbade the district court from sentencing him based on acquitted conduct and thereby depriving him of the "right to the presumption of innocence." Binding precedent from our circuit establishes the contrary. *See United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc) (concluding that "the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range"). *See also United States v. Rayyan*, 885 F.3d 436, 441 (6th Cir. 2018) (explaining that "the Supreme Court has confirmed that sentencing courts may look to uncharged criminal conduct, indeed even acquitted conduct, to enhance a sentence within the statutorily authorized range").

David acknowledges that precedent permits this result. He claims, however, that the Supreme Court abrogated that rule in *Nelson v. Colorado*, 137 S. Ct. 1249 (2017). We disagree.

In *Nelson*, the Supreme Court invalidated a Colorado statute that required a person whose conviction had been overturned to prove her innocence by clear and convincing evidence in order to receive a refund of costs, fees, and restitution paid pursuant to the invalid conviction. *Id.* at 1254–55. The Court determined that this statute violated due process and explained that "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty enough for monetary executions." *Id.* at 1255–56. But *Nelson* did not implicate the Guidelines. Nor did it overrule, or even mention, prior Supreme Court precedent holding that courts can consider acquitted conduct for sentencing purposes. *See, e.g.*, *United States v. Watts*, 519 U.S. 148, 157 (1997) ("We therefore hold that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."). And David has made no argument that the *Matthews v. Eldridge,* three-part balancing test, which the Court applied in *Nelson*, would balance out the same

way in his case, even if that test applies.[6] *See Nelson*, 137 S. Ct. at 1255. In short, *Nelson* is not an "inconsistent decision of the United States Supreme Court" that would permit or require modification of our controlling precedent. *Salmi* v. *Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).

This court's decision in *White* held that a "district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range." 551 F.3d at 385. David's within-Guidelines sentence of seventy-four months' imprisonment was neither unconstitutional nor procedurally unreasonable.

\* \* \*

We AFFIRM the judgment of the district court in both cases.

---

[6] The Court in *Nelson* explained that its ruling in that case was governed by the "familiar procedural due process inspection instructed by *Mathews v. Eldridge*," which governs when "no further criminal process is implicated." *Nelson*, 137 S. Ct. at 1255. Here, David argues that his criminal sentence—an integral part of the criminal process—is unconstitutional. One might argue, therefore, that to the extent his claim sounds in due process, it should be evaluated under the test set forth in *Medina v. California*, 505 U.S. 437 (1995), which *Nelson* reminds us "'provide[s] the appropriate framework for assessing the validity of state procedural rules' that 'are part of the criminal process.'" *Nelson*, 137 S. Ct. at 1255 (alteration in original). Whether it matters that David tests a federal, rather than state, criminal sentence remains an open question, *see Kaley v. United States*, 571 U.S. 320, 334 (2014). But for present purposes, the result is the same. David has made no argument under either *Matthews* or *Medina.*